# EXHIBIT A

## STANDARD AGREEMENT FOR THE SALE OF REAL ESTATE

ASR

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

| PARTIES | |
|---|---|
| **BUYER(S):** Paula Bickelman | **SELLER(S):** Stephen Reichert<br>Deborah Reichert |
| **BUYER'S MAILING ADDRESS:**<br>146 Stone Hill Dr Pottstown PA 19464 | **SELLER'S MAILING ADDRESS:**<br>1350 Shady Ln Chester Springs PA 19425 |

### PROPERTY

ADDRESS (including postal city) 122 E 3rd St Pottstown PA 19464

ZIP 19464-5280 ,

in the municipality of Pottstown Borough , County of ,

in the School District of , in the Commonwealth of Pennsylvania.

Tax ID #(s): 16-00-29244-008 and/or

Identification (e.g., Parcel #; Lot, Block; Deed Book, Page, Recording Date):

### BUYER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ **No Business Relationship (Buyer is not represented by a broker)**

Broker (Company) EXP REALTY LLC

Company License # RO301852

Company Address 168 W Ridge Pike #131, Limerick , PA 19468

Company Phone (610)579-9514

Company Fax (610)340-2263

Broker is (check only one):

☒ Buyer Agent (Broker represents Buyer only)

☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) (Name) Ralph and Karen Chiodo

State License # RM423314 RS276193

Direct Phone(s) (610)579-9514

Cell Phone(s) (610)517-4117

Email Karen@chiodoteam.com

Licensee(s) is (check only one):

☐ Buyer Agent (all company licensees represent Buyer)

☒ Buyer Agent with Designated Agency (only Licensee(s) named above represent Buyer)

☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Buyer)

### SELLER'S RELATIONSHIP WITH PA LICENSED BROKER

☒ **No Business Relationship (Seller is not represented by a broker)**

Broker (Company)

Company License #

Company Address

Company Phone

Company Fax

Broker is (check only one):

☐ Seller Agent (Broker represents Seller only)

☐ Dual Agent (See Dual and/or Designated Agent box below)

Licensee(s) (Name)

State License #

Direct Phone(s)

Cell Phone(s)

Email

Licensee(s) is (check only one):

☐ Seller Agent (all company licensees represent Seller)

☐ Seller Agent with Designated Agency (only Licensee(s) named above represent Seller)

☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Seller)

### DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Buyer and Seller in the same transaction. A Licensee is a Dual Agent when a Licensee represents Buyer and Seller in the same transaction. All of Broker's licensees are also Dual Agents UNLESS there are separate Designated Agents for Buyer and Seller. If the same Licensee is designated for Buyer and Seller, the Licensee is a Dual Agent.

**By signing this Agreement, Buyer and Seller each acknowledge having been previously informed of, and consented to, dual agency, if applicable.**

Buyer Initials: [DS initials]      ASR Page 1 of 14      Seller Initials: _____

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2020
rev. 5/20; rel. 7/20

EXP REALTY LLC, 168 W Ridge Pike #131 Limerick PA 19468      Phone: 6105799514      Fax: 6103402263      122 E 3rd St

Ralph and Karen Chiodo      Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

1. **By this Agreement,** dated <u>August 6, 2020</u>
   Seller hereby agrees to sell and convey to Buyer, who agrees to purchase, the identified Property.

2. **PURCHASE PRICE AND DEPOSITS (4-14)**
   (A) Purchase Price $ <u>125,000.00</u>
   <u>(One Hundred Twenty-Five Thousand</u>
   _____ U.S. Dollars), to be paid by Buyer as follows:
   | | | |
   |---|---|---|
   | 1. | Initial Deposit, within _____ days (5 if not specified) of Execution Date, if not included with this Agreement: | $ _____ 12,500.00 |
   | 2. | Additional Deposit within _____ days of the Execution Date: | $ _____ |
   | 3. | _____ | $ _____ |

   Remaining balance will be paid at settlement.
   (B) **All funds paid by Buyer, including deposits, will be paid by check, cashier's check or wired funds. All funds paid by Buyer within 30 days of settlement, including funds paid at settlement, will be by cashier's check or wired funds, but not by personal check.**
   (C) Deposits, regardless of the form of payment, will be paid in U.S. Dollars to Broker for Seller (unless otherwise stated here: <u>Sellers Attorney - Smith Kane Holman, LLC</u>)
   who will retain deposits in an escrow account in conformity with all applicable laws and regulations until consummation or termination of this Agreement. Only real estate brokers are required to hold deposits in accordance with the rules and regulations of the State Real Estate Commission. Checks tendered as deposit monies may be held uncashed pending the execution of this Agreement.

3. **SELLER ASSIST (If Applicable) (1-10)**
   Seller will pay $ _____ or _____ % of Purchase Price (0 if not specified) toward Buyer's costs, as permitted by the mortgage lender, if any. Seller is only obligated to pay up to the amount or percentage which is approved by mortgage lender.

4. **SETTLEMENT AND POSSESSION (4-14)**
   (A) Settlement Date is <u>September 11, 2020</u>, or before if Buyer and Seller agree.
   (B) Settlement will occur in the county where the Property is located or in an adjacent county, during normal business hours, unless Buyer and Seller agree otherwise.
   (C) At time of settlement, the following will be pro-rated on a daily basis between Buyer and Seller, reimbursing where applicable: current taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees; water and/or sewer fees, together with any other lienable municipal service fees. All charges will be prorated for the period(s) covered. Seller will pay up to and including the date of settlement and Buyer will pay for all days following settlement, unless otherwise stated here: _____
   (D) For purposes of prorating real estate taxes, the "periods covered" are as follows:
      1. Municipal tax bills for all counties and municipalities in Pennsylvania are for the period from January 1 to December 31.
      2. School tax bills for the Philadelphia, Pittsburgh and Scranton School Districts are for the period from January 1 to December 31. School tax bills for all other school districts are for the period from July 1 to June 30.
   (E) Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here: _____
   (F) Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here: <u>2% paid by the buyer</u>
   (G) Possession is to be delivered by deed, existing keys and physical possession to a vacant Property free of debris, with all structures broom-clean, at day and time of settlement, unless Seller, before signing this Agreement, has identified in writing that the Property is subject to a lease.
   (H) If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.
   ☐ **Tenant-Occupied Property Addendum (PAR Form TOP) is attached and made part of this Agreement.**

5. **DATES/TIME IS OF THE ESSENCE (1-10)**
   (A) Written acceptance of all parties will be on or before: <u>August 17, 2020</u>
   (B) The Settlement Date and all other dates and times identified for the performance of any obligations of this Agreement are of the essence and are binding.
   (C) The Execution Date of this Agreement is the date when Buyer and Seller have indicated full acceptance of this Agreement by signing and/or initialing it. For purposes of this Agreement, the number of days will be counted from the Execution Date, excluding the day this Agreement was executed and including the last day of the time period. **All changes to this Agreement should be initialed and dated.**
   (D) The Settlement Date is not extended by any other provision of this Agreement and may only be extended by mutual written agreement of the parties.
   (E) Certain terms and time periods are pre-printed in this Agreement as a convenience to the Buyer and Seller. All pre-printed terms and time periods are negotiable and may be changed by striking out the pre-printed text and inserting different terms acceptable to all parties, except where restricted by law.

65  6.  **ZONING (4-14)**
66     Failure of this Agreement to contain the zoning classification (except in cases where the property {and each parcel thereof, if subdi-
67     vidable} is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at Buyer's option, and, if
68     voided, any deposits tendered by the Buyer will be returned to the Buyer without any requirement for court action.
69     **Zoning Classification, as set forth in the local zoning ordinance:** Residential
70  7.  **FIXTURES AND PERSONAL PROPERTY (1-20)**
71     (A) It is possible for certain items of personal property to be so integrated into the Property that they become fixtures and will be
72         regarded as part of the Property and therefore included in a sale. Buyer and Seller are encouraged to be specific when negotiating
73         what items will be included or excluded in this sale.
74     (B) INCLUDED in this sale, unless otherwise stated, are all existing items permanently installed in or on the Property, free of liens,
75         and other items including plumbing; heating; gas fireplace logs; radiator covers; hardwired security systems; thermostats; lighting
76         fixtures (including chandeliers and ceiling fans); pools, spas and hot tubs (including covers and cleaning equipment); electric
77         animal fencing systems (excluding collars); garage door openers and transmitters; mounting brackets and hardware for television
78         and sound equipment; unpotted shrubbery, plantings and trees; smoke detectors and carbon monoxide detectors; sump pumps;
79         storage sheds; fences; mailboxes; wall to wall carpeting; existing window screens, storm windows and screen/storm doors; win-
80         dow covering hardware (including rods and brackets), shades and blinds; awnings; central vacuum system (with attachments);
81         built-in air conditioners; built-in appliances; the range/oven; dishwashers; trash compactors; any remaining heating and cooking
82         fuels stored on the Property at the time of settlement; and, if owned, solar panels, windmills, water treatment systems, propane
83         tanks and satellite dishes. Unless stated otherwise, the following items are included in the sale, at no additional cost: _____
84         _____
85         _____
86     (C) The following items are not owned by Seller and may be subject to a lease or other financing agreement. Contact the provider/
87         vendor for more information (e.g., solar panels, windmills, water treatment systems, propane tanks and satellite dishes): _____
88         _____
89     (D) EXCLUDED fixtures and items: _____
90         _____
91  8.  **MORTGAGE CONTINGENCY (10-18)**
92     ☒  WAIVED. This sale is NOT contingent on mortgage financing, although Buyer may obtain mortgage financing and/or the parties
93         may include an appraisal contingency.
94     ☐  ELECTED.
95     (A) This sale is contingent upon Buyer obtaining mortgage financing according to the following terms:

| First Mortgage on the Property | Second Mortgage on the Property |
|---|---|
| Loan Amount $ _____ | Loan Amount $ _____ |
| Minimum Term _____ years | Minimum Term _____ years |
| Type of mortgage _____ | Type of mortgage _____ |
| For conventional loans, the Loan-To-Value (LTV) ratio is not to exceed _____ % | For conventional loans, the Loan-To-Value (LTV) ratio is not to exceed _____ % |
| Mortgage lender _____ | Mortgage lender _____ |
| Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the mortgage lender, not to exceed a maximum interest rate of** _____. | Interest rate _____ %; however, **Buyer agrees to accept the interest rate as may be committed by the mortgage lender, not to exceed a maximum interest rate of** _____ %. |
| Discount points, loan origination, loan placement and other fees charged by the lender as a percentage of the mortgage loan (exclud-ing any mortgage insurance premiums or VA funding fee) not to exceed _____ % (0% if not specified) of the mortgage loan. | Discount points, loan origination, loan placement and other fees charged by the lender as a percentage of the mortgage loan (exclud-ing any mortgage insurance premiums or VA funding fee) not to exceed _____ % (0% if not specified) of the mortgage loan. |

111    (B) Upon receiving documentation demonstrating lender's approval, whether conditional or outright, of Buyer's mortgage applica-
112        tion(s) according to the terms set forth above, Buyer will promptly deliver a copy of the documentation to Seller, but in any case
113        no later than _____.
114        1.  If Seller does not receive a copy of the documentation demonstrating lender's conditional or outright approval of Buyer's mort-
115            gage application(s) by the date indicated above, Seller may terminate this Agreement by written notice to Buyer. Seller's right
116            to terminate continues until Buyer delivers documentation demonstrating lender's conditional or outright approval of Buyer's
117            mortgage application(s) to Seller. Until Seller terminates this Agreement pursuant to this Paragraph, Buyer must continue to
118            make a good faith effort to obtain mortgage financing.
119        2.  Seller may terminate this Agreement by written notice to Buyer after the date indicated above if the documentation demon-
120            strating lender's conditional or outright approval of Buyer's mortgage application(s):
121            a.  Does not satisfy the terms of Paragraph 8(A), OR
122            b.  Contains any condition not specified in this Agreement (e.g., Buyer must settle on another property, an appraisal must be
123                received by the lender, or the approval is not valid through the Settlement Date) that is not satisfied and/or removed in
124                writing by the mortgage lender(s) within    7   DAYS after the date indicated in Paragraph 8(B), or any extension there-
125                of, other than those conditions that are customarily satisfied at or near settlement (e.g., obtaining insurance, confirming
126                employment).
127        3.  If this Agreement is terminated pursuant to Paragraphs 8(B)(1) or (2), or the mortgage loan(s) is not obtained for settlement,

128    Buyer Initials: _GB_                 ASR Page 3 of 14                 Seller Initials: _____

129  all deposit monies will be returned to Buyer according to the terms of Paragraph 26 and this Agreement will be VOID. Buyer
130  will be responsible for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of this
131  Agreement, and any costs incurred by Buyer for: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee
132  for cancellation; (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation;
133  (3) Appraisal fees and charges paid in advance to mortgage lender(s).

134  (C)  The Loan-To-Value ratio (LTV) is used by lenders as one tool to help assess their potential risk of a mortgage loan. A particular
135  LTV may be necessary to qualify for certain loans, or buyers might be required to pay additional fees if the LTV exceeds a spe-
136  cific level. The appraised value of the Property may be used by lenders to determine the maximum amount of a mortgage loan.
137  The appraised value is determined by an independent appraiser, subject to the mortgage lender's underwriter review, and may be
138  higher or lower than the Purchase Price and/or market price of the property.

139  (D)  The interest rate(s) and fee(s) provisions in Paragraph 8(A) are satisfied if the mortgage lender(s) gives Buyer the right to guarantee
140  the interest rate(s) and fee(s) at or below the maximum levels stated. If lender(s) gives Buyer the right to lock in the interest rate(s),
141  Buyer will do so at least _____15_____ days before Settlement Date. Buyer gives Seller the right, at Seller's sole option and as permitted
142  by law and the mortgage lender(s), to contribute financially, without promise of reimbursement, to Buyer and/or the mortgage
143  lender(s) to make the above mortgage term(s) available to Buyer.

144  (E)  Within _____ days (7 if not specified) from the Execution Date of this Agreement, Buyer will make a completed mortgage appli-
145  cation (including payment for and ordering of credit reports without delay) for the mortgage terms and to the mortgage lender(s)
146  identified in Paragraph 8(A), if any, otherwise to a responsible mortgage lender(s) of Buyer's choice. Broker for Buyer, if any,
147  otherwise Broker for Seller, is authorized to communicate with the mortgage lender(s) to assist in the mortgage loan process.
148  Broker for Seller, if any, is permitted to contact the mortgage lender(s) at any time to determine the status of the mortgage loan
149  application.

150  (F)  **Buyer will be in default of this Agreement if Buyer furnishes false information** to anyone concerning Buyer's financial and/
151  or employment status, fails to cooperate in good faith with processing the mortgage loan application (including payment for and
152  ordering of appraisal without delay), fails to lock in interest rate(s) as stated in Paragraph 8(D), or otherwise causes the lender to
153  reject, or refuse to approve or issue, a mortgage loan commitment.

154  (G)  If the mortgage lender(s), or a property and casualty insurer providing insurance required by the mortgage lender(s), requires
155  repairs to the Property, Buyer will, upon receiving the requirements, deliver a copy of the requirements to Seller. Within _____5_____
156  DAYS of receiving the copy of the requirements, Seller will notify Buyer whether Seller will make the required repairs at Seller's
157  expense.

158   1.  If Seller makes the required repairs to the satisfaction of the mortgage lender and/or insurer, Buyer accepts the Property and
159      agrees to the RELEASE in Paragraph 28 of this Agreement.

160   2.  If Seller will not make the required repairs, **or if Seller fails to respond within the stated time,** Buyer will, within _____5_____
161      DAYS, notify Seller of Buyer's choice to:

162      a.  Make the repairs/improvements at Buyer's expense, with permission and access to the Property given by Seller, which
163          will not be unreasonably withheld (Seller may require that Buyer sign a pre-settlement possession agreement such as the
164          Pre-Settlement Possession Addendum [PAR Form PRE], which shall not, in and of itself, be considered unreasonable), OR

165      b.  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
166          Paragraph 26 of this Agreement.

167      **If Buyer fails to respond** within the time stated in Paragraph 8(G)(2) or fails to terminate this Agreement by written notice
168      to Seller within that time, **Buyer will accept the Property,** make the required repairs/improvements at Buyer's expense and
169      agree to the RELEASE in Paragraph 28 of this Agreement.

170  **FHA/VA, IF APPLICABLE**

171  (H)  It is expressly agreed that notwithstanding any other provisions of this contract, Buyer will not be obligated to complete the pur-
172  chase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Buyer
173  has been given, in accordance with HUD/FHA or VA requirements, a written statement by the Federal Housing Commissioner,
174  Veterans Administration, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than
175  $ _____ (the Purchase Price as stated in this Agreement). Buyer will have the privilege and option of
176  proceeding with consummation of the contract without regard to the amount of the appraised valuation. The appraised valuation
177  is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does
178  not warrant the value nor the condition of the Property. Buyer should satisfy himself/herself that the price and condition of the
179  Property are acceptable.
180  **Warning:** Section 1010 of Title 18, U.S.C., Department of Housing and Urban Development and Federal Housing
181  Administration Transactions, provides, "Whoever for the purpose of influencing in any way the action of such Department,
182  makes, passes, utters or publishes any statement, knowing the same to be false shall be fined under this title or imprisoned not
183  more than two years, or both."

184  (I)  **U.S. Department of Housing and Urban Development (HUD) NOTICE TO PURCHASERS: Buyer's Acknowledgement**
185      ☐  Buyer has received the HUD Notice "For Your Protection: Get a Home Inspection." Buyer understands the importance of
186      getting an independent home inspection and has thought about this before signing this Agreement. Buyer understands that
187      FHA will not perform a home inspection nor guarantee the price or condition of the Property.

188  (J)  **Certification** We the undersigned, Seller(s) and Buyer(s) party to this transaction each certify that the terms of this contract
189      for purchase are true to the best of our knowledge and belief, and that any other agreement entered into by any of these parties
190      in connection with this transaction is attached to this Agreement.

191  Buyer Initials: _____                    ASR Page 4 of 14                    Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-9EDDCA8A3478

192  **9.  CHANGE IN BUYER'S FINANCIAL STATUS (9-18)**
193       If a change in Buyer's financial status affects Buyer's ability to purchase, Buyer will promptly notify Seller and lender(s) to whom the
194       Buyer submitted a mortgage application, if any, in writing. A change in financial status includes, but is not limited to, loss or a change
195       in employment; failure or loss of sale of Buyer's home; Buyer's having incurred a new financial obligation; entry of a judgment against
196       Buyer. **Buyer understands that applying for and/or incurring an additional financial obligation may affect Buyer's ability to**
197       **purchase.**
198  **10.  SELLER REPRESENTATIONS (1-20)**
199       **(A)  Status of Water**
200            Seller represents that the Property is served by:
201            [X] Public Water    ☐ Community Water    ☐ On-site Water    ☐ None    ☐ _____
202       **(B)  Status of Sewer**
203            1.  Seller represents that the Property is served by:
204                [X] Public Sewer          ☐ Community Sewage Disposal System          ☐ Ten-Acre Permit Exemption (see Sewage Notice 2)
205                ☐ Individual On-lot Sewage Disposal System (see Sewage Notice 1)          ☐ Holding Tank (see Sewage Notice 3)
206                ☐ Individual On-lot Sewage Disposal System in Proximity to Well (see Sewage Notice 1; see Sewage Notice 4, if applicable)
207                ☐ None (see Sewage Notice 1)          ☐ None Available/Permit Limitations in Effect (see Sewage Notice 5)
208                ☐
209            2.  **Notices Pursuant to the Pennsylvania Sewage Facilities Act**
210                **Notice 1: There is no currently existing community sewage system available for the subject property.** Section 7 of the
211                Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construction, alter,
212                repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtaining a
213                permit. Buyer is advised by this notice that, before signing this Agreement, Buyer should contact the local agency charged with
214                administering the Act to determine the procedure and requirements for obtaining a permit for an individual sewage system. The
215                local agency charged with administering the Act will be the municipality where the Property is located or that municipality
216                working cooperatively with others.
217                **Notice 2: This Property is serviced by an individual sewage system installed under the ten-acre permit exemption**
218                **provisions of Section 7 of the Pennsylvania Sewage Facilities Act.** (Section 7 provides that a permit may not be required
219                before installing, constructing, awarding a contract for construction, altering, repairing or connecting to an individual sewage
220                system where a ten-acre parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils and
221                site testing were not conducted and that, should the system malfunction, the owner of the Property or properties serviced by
222                the system at the time of a malfunction may be held liable for any contamination, pollution, public health hazard or nuisance
223                which occurs as a result.
224                **Notice 3: This Property is serviced by a holding tank (permanent or temporary) to which sewage is conveyed by a**
225                **water carrying system and which is designed and constructed to facilitate ultimate disposal of the sewage at another**
226                **site.** Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the
227                tank from the date of its installation or December 14, 1995, whichever is later.
228                **Notice 4: An individual sewage system has been installed at an isolation distance from a well that is less than the dis-**
229                **tance specified by regulation.** The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances
230                provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water
231                supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the hor-
232                izontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the
233                absorption area shall be 100 feet.
234                **Notice 5: This lot is within an area in which permit limitations are in effect and is subject to those limitations.** Sewage
235                facilities are not available for this lot and construction of a structure to be served by sewage facilities may not begin until
236                the municipality completes a major planning requirement pursuant to the Pennsylvania Sewage Facilities Act and regulations
237                promulgated thereunder.
238       **(C)  Historic Preservation**
239            Seller is not aware of historic preservation restrictions regarding the Property unless otherwise stated here: _____
240            _____
241       **(D)  Land Use Restrictions**
242            1.  ☐ Property, or a portion of it, is subject to land use restrictions and may be preferentially assessed for tax purposes under the
243                following Act(s) (see Notices Regarding Land Use Restrictions below):
244                ☐ Agricultural Area Security Law (Right-to-Farm Act; Act 43 of 1981; 3 P.S. §901 et seq.)
245                ☐ Farmland and Forest Land Assessment Act (Clean and Green Program; Act 319 of 1974; 72 P.S. § 5490.1 et seq.)
246                ☐ Open Space Act (Act 442 of 1967; 32 P.S. § 5001 et seq.)
247                ☐ Conservation Reserve Program (16 U.S.C. § 3831 et seq.)
248                ☐ Other _____
249            2.  **Notices Regarding Land Use Restrictions**
250                a.  **Pennsylvania Right-To-Farm Act:** The property you are buying may be located in an area where agricultural operations
251                    take place. Pennsylvania protects agricultural resources for the production of food and agricultural products. The law limits
252                    circumstances where normal agricultural operations may be subject to nuisance lawsuits or restrictive ordinances.
253                b.  **Clean and Green Program:** Properties enrolled in the Clean and Green Program receive preferential property tax assess-
254                    ment. Buyer and Seller have been advised of the need to contact the County Tax Assessment Office before the execution
255                    of this Agreement to determine the property tax implications that will or may result from the sale of the Property, or that
256                    may result in the future as a result of any change in use of the Property or the land from which it is being separated.
257  Buyer Initials: _____                    ASR Page 5 of 14                    Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-964A0E00E25F

258      c. **Open Space Act:** This Act enables counties to enter into covenants with owners of land designated as farm, forest, water
259      supply, or open space land on an adopted municipal, county or regional plan for the purpose of preserving the land as open
260      space. A covenant between the owner and county is binding upon any Buyer of the Property during the period of time that
261      the covenant is in effect (5 or 10 years). Covenants automatically renew at the end of the covenant period unless specific
262      termination notice procedures are followed. Buyer has been advised of the need to determine the restrictions that will apply
263      from the sale of the Property to Buyer and the property tax implications that will or may result from a change in use of the
264      Property, or any portion of it. Buyer is further advised to determine the term of any covenant now in effect.
265      d. **Conservation Reserve (Enhancement) Program:** Properties enrolled in the Conservation Reserve Program or CREP are
266      environmentally-sensitive areas, the owners of which receive compensation in exchange for an agreement to maintain the
267      land in its natural state. Contracts last from 10 to 15 years and carry penalties to Seller if terminated early by Buyer. Buyer
268      has been advised of the need to determine the restrictions on development of the Property and the term of any contract now
269      in effect. Seller is advised to determine the financial implications that will or may result from the sale of the Property.
270 (E) **Real Estate Seller Disclosure Law**
271      Generally, the Real Estate Seller Disclosure Law requires that before an agreement of sale is signed, the seller in a residential real
272      estate transfer must make certain disclosures regarding the property to potential buyers in a form defined by the law. A residential
273      real estate transfer is defined as a sale, exchange, installment sales contract, lease with an option to buy, grant or other transfer of
274      an interest in real property where **NOT LESS THAN ONE AND NOT MORE THAN FOUR RESIDENTIAL DWELLING**
275      **UNITS** are involved. Disclosures for condominiums and cooperatives are limited to the seller's particular unit(s). Disclosures
276      regarding common areas or facilities are not required, as those elements are already addressed in the laws that govern the resale
277      of condominium and cooperative interests.
278 (F) **Public and/or Private Assessments**
279      1. Seller represents that, as of the date Seller signed this Agreement, no public improvement, condominium or homeowner asso-
280      ciation assessments have been made against the Property which remain unpaid, and that no notice by any government or public
281      authority (excluding assessed value) has been served upon Seller or anyone on Seller's behalf, including notices relating to
282      violations of zoning, housing, building, safety or fire ordinances that remain uncorrected, and that Seller knows of no condition
283      that would constitute a violation of any such ordinances that remain uncorrected, unless otherwise specified here: _____
284
285      2. Seller knows of no other potential notices (including violations) and/or assessments except as follows: _____
286
287 (G) **Highway Occupancy Permit**
288      Access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.
289 (H) **Internet of Things (IoT) Devices**
290      1. The presence of smart and green home devices that are capable of connecting to the Internet, directly or indirectly, and the data
291      stored on those various devices make up a digital ecosystem in the Property sometimes referred to as the "Internet of Things
292      (IoT)." Buyer and Seller acknowledge that IoT devices may transmit data to third parties outside of the control of their owner.
293      2. On or before settlement, Seller will make a reasonable effort to clear all data stored on all IoT devices located on the Property
294      and included in the sale. Seller further acknowledges that all personal devices owned by Seller (including but not limited to
295      cellular telephones, personal computers and tablets) having connectivity to any IoT device(s) located on the Property will be
296      disconnected and cleared of relevant data prior to settlement. Further, no attempts will be made after settlement by Seller or
297      anyone on Seller's behalf to access any IoT devices remaining on the Property.
298      3. Following settlement, Buyer will make a reasonable effort to clear all stored data from any IoT device(s) remaining on the
299      Property and to restrict access to said devices by Seller, Seller's agents or any third party to whom Seller may have previously
300      provided access. This includes, but is not limited to, restoring IoT devices to original settings, changing passwords or codes,
301      updating network settings and submitting change of ownership and contact information to device manufacturers and service
302      providers.
303      4. This paragraph will survive settlement.
304 **11. WAIVER OF CONTINGENCIES (9-05)**
305      If this Agreement is contingent on Buyer's right to inspect and/or repair the Property, or to verify insurability, environmental condi-
306      tions, boundaries, certifications, zoning classification or use, or any other information regarding the Property, **Buyer's failure to exer-**
307      **cise any of Buyer's options within the times set forth in this Agreement is a WAIVER of that contingency and Buyer accepts**
308      **the Property and agrees to the RELEASE in Paragraph 28 of this Agreement.**
309 **12. BUYER'S DUE DILIGENCE/INSPECTIONS (10-18)**
310 (A) **Rights and Responsibilities**
311      1. Seller will provide access to insurers' representatives and, as may be required by this Agreement or by mortgage lender(s), to
312      surveyors, municipal officials, appraisers and inspectors; in addition, unless otherwise agreed, only Parties and their real estate
313      licensee(s) may attend any inspections.
314      2. Buyer may make two pre-settlement walk-through inspections of the Property for the limited purpose of determining that the
315      condition of the Property is as required by this Agreement and any addenda. Buyer's right to these inspections is not waived
316      by any other provision of this Agreement.
317      3. **Seller will have heating and all utilities (including fuel(s)) on for all inspections/appraisals.**
318      4. All inspectors, including home inspectors, are authorized by Buyer to provide a copy of any inspection Report to Broker for
319      Buyer.
320      5. Seller has the right, upon request, to receive a free copy of any inspection Report from the party for whom it was prepared.
321      Unless otherwise stated, Seller does not have the right to receive a copy of any lender's appraisal report.



322    Buyer Initials: _____        ASR Page 6 of 14        Seller Initials: _____

323    (B)  Buyer waives or elects at Buyer's expense to have the following inspections, certifications, and investigations (referred to as
324          "Inspection" or "Inspections") performed by professional contractors, home inspectors, engineers, architects and other properly
325          licensed or otherwise qualified professionals. All inspections shall be non-invasive, unless otherwise agreed in writing. If the same
326          inspector is inspecting more than one system, the inspector must comply with the Home Inspection Law. (See Paragraph 12(D)
327          for Notices Regarding Property and Environmental Inspections)
328    (C)  For elected Inspection(s), Buyer will, within the Contingency Period stated in Paragraph 13(A), complete Inspections, obtain any
329          Inspection Reports or results (referred to as "Report" or "Reports"), and accept the Property, terminate this Agreement, or submit
330          a written corrective proposal to Seller, according to the terms of Paragraph 13(B).

**Home/Property Inspections and Environmental Hazards (mold, etc.)**

331              *Waived*
332  Elected  Buyer may conduct an inspection of the Property's structural components; roof; exterior windows and exterior
333          doors; exterior building material, fascia, gutters and downspouts; swimming pools, hot tubs and spas; appliances;
334          electrical systems; interior and exterior plumbing; public sewer systems; heating and cooling systems; water penetra-
335          tion; electromagnetic fields; wetlands and flood plain delineation; structure square footage; mold and other environ-
336          mental hazards (e.g., fungi, indoor air quality, asbestos, underground storage tanks, etc.); and any other items Buyer
337          may select. If Buyer elects to have a home inspection of the Property, as defined in the Home Inspection Law, the
338          home inspection must be performed by a full member in good standing of a national home inspection association,
339          or a person supervised by a full member of a national home inspection association, in accordance with the ethical
340          standards and code of conduct or practice of that association, or by a properly licensed or registered engineer or
341          architect. (See Notices Regarding Property & Environmental Inspections)

**Wood Infestation**

342              *Waived*
343  Elected  Buyer may obtain a written "Wood-Destroying Insect Infestation Inspection Report" from an inspector certified as a
344          wood-destroying pests pesticide applicator and will deliver it and all supporting documents and drawings provided
345          by the inspector to Seller. The Report is to be made satisfactory to and in compliance with applicable laws, mort-
346          gage lender requirements, and/or Federal Insuring and Guaranteeing Agency requirements. The Inspection is to be
347          limited to all readily-visible and accessible areas of all structures on the Property, except fences. If the Inspection
348          reveals active infestation(s), Buyer, at Buyer's expense, may obtain a Proposal from a wood-destroying pests pesti-
349          cide applicator to treat the Property. If the Inspection reveals damage from active or previous infestation(s), Buyer
350          may obtain a written Report from a professional contractor, home inspector or structural engineer that is limited to
351          structural damage to the Property caused by wood-destroying organisms and a Proposal to repair the Property.

**Deeds, Restrictions and Zoning**

352              *Waived*
353  Elected  Buyer may investigate easements, deed and use restrictions (including any historic preservation restrictions or ordi-
354          nances) that apply to the Property and review local zoning ordinances. Buyer may verify that the present use of the
355          Property (such as in-law quarters, apartments, home office, day care, commercial or recreational vehicle parking)
356          is permitted and may elect to make the Agreement contingent upon an anticipated use. Present use: _____
357

**Water Service**

358              *Waived*
359  Elected  Buyer may obtain an Inspection of the quality and quantity of the water system from a properly licensed or otherwise
360          qualified water/well testing company. If and as required by the inspection company, Seller, at Seller's expense, will
361          locate and provide access to the on-site (or individual) water system. Seller will restore the Property to its previous
362          condition, at Seller's expense, prior to settlement.

**Radon**

363              *Waived*
364  Elected  Buyer may obtain a radon test of the Property from a certified inspector. The U.S. Environmental Protection
365          Agency (EPA) advises corrective action if the average annual exposure to radon is equal to or higher than 0.02
366          working levels or 4 picoCuries/liter (4pCi/L). Radon is a natural, radioactive gas that is produced in the ground
367          by the normal decay of uranium and radium. Studies indicate that extended exposure to high levels of radon gas
368          can increase the risk of lung cancer. Radon can find its way into any air-space and can permeate a structure. If a
369          house has a radon problem, it usually can be cured by increased ventilation and/or by preventing radon entry. Any
370          person who tests, mitigates or safeguards a building for radon in Pennsylvania must be certified by the Department
371          of Environmental Protection. Information about radon and about certified testing or mitigation firms is available
372          through Department of Environmental Protection, Bureau of Radiation Protection, 13th Floor, Rachel Carson State
373          Office Building, P.O. Box 8469, Harrisburg, PA 17105-8469, (800) 23RADON or (717) 783-3594. www.epa.gov

**On-lot Sewage (If Applicable)**

374              *Waived*
375  Elected  Buyer may obtain an Inspection of the individual on-lot sewage disposal system, which may include a hydraulic
376          load test, from a qualified, professional inspector. If and as required by the inspection company, Seller, at Seller's
377          expense, will locate, provide access to, empty the individual on-lot sewage disposal system and provide all water
378          needed, unless otherwise agreed. Seller will restore the Property to its previous condition, at Seller's expense,
379          prior to settlement. See Paragraph 13(C) for more information regarding the Individual On-lot Sewage Inspection
380          Contingency.

**Property and Flood Insurance**

381              *Waived*
382  Elected  Buyer may determine the insurability of the Property by making application for property and casualty insurance
383          for the Property to a responsible insurer. Broker for Buyer, if any, otherwise Broker for Seller, may communicate
384          with the insurer to assist in the insurance process. If the Property is located in a specially-designated flood zone,
385          Buyer may be required to carry flood insurance at Buyer's expense, which may need to be ordered 14 days or more
386          prior to Settlement Date. Revised flood maps and changes to Federal law may substantially increase future flood

387  Buyer Initials: _____        ASR Page 7 of 14        Seller Initials: _____

| | | |
|---|---|---|
| 388 | | insurance premiums or require insurance for formerly exempt properties. Buyer should consult with one or more |
| 389 | | flood insurance agents regarding the need for flood insurance and possible premium increases. |
| 390 | | **Property Boundaries** |
| 391 | Elected | Buyer may engage the services of a surveyor, title abstractor, or other qualified professional to assess the legal |
| 392 | | description, certainty and location of property boundaries and/or quantum of land. Most sellers have not had the Property |
| 393 | | surveyed as it is not a requirement of property transfer in Pennsylvania. Any fences, hedges, walls and other natural |
| 394 | | or constructed barriers may or may not represent the true boundary lines of the Property. Any numerical represen- |
| 395 | | tations of size of property are approximations only and may be inaccurate. |
| 396 | | **Lead-Based Paint Hazards (For Properties built prior to 1978 only)** |
| 397 | Elected | Before Buyer is obligated to purchase a residential dwelling built prior to 1978, Buyer has the option to conduct |
| 398 | | a risk assessment and/or inspection of the Property for the presence of lead-based paint and/or lead-based paint |
| 399 | | hazards. **Regardless of whether this inspection is elected or waived, the Residential Lead-Based Paint Hazard** |
| 400 | | **Reduction Act requires a seller of property built prior to 1978 to provide the Buyer with an EPA-approved** |
| 401 | | **lead hazards information pamphlet titled "Protect Your Family from Lead in Your Home," along with a** |
| 402 | | **separate form, attached to this Agreement, disclosing Seller's knowledge of lead-based paint hazards and** |
| 403 | | **any lead-based paint records regarding the Property.** |
| 404 | | **Other** |
| 405 | Elected | |
| 406 | | |
| 407 | | The Inspections elected above do not apply to the following existing conditions and/or items: |
| 408 | | |
| 409 | | |

**(D) Notices Regarding Property & Environmental Inspections**

410    1.  Exterior Building Materials: Poor or improper installation of exterior building materials may result in moisture penetrating
411        the surface of a structure where it may cause mold and damage to the building's frame.
413    2.  Asbestos: Asbestos is linked with several adverse health effects, including various forms of cancer.
414    3.  Environmental Hazards: The U.S. Environmental Protection Agency has a list of hazardous substances, the use and disposal
415        of which are restricted by law. Generally, if hazardous substances are found on a property, it is the property owner's respon-
416        sibility to dispose of them properly.
417    4.  Wetlands: Wetlands are protected by the federal and state governments. Buyer may wish to hire an environmental engineer
418        to investigate whether the Property is located in a wetlands area to determine if permits for plans to build, improve or develop
419        the property would be affected or denied because of its location in a wetlands area.
420    5.  Mold, Fungi and Indoor Air Quality: Indoor mold contamination and the inhalation of bioaerosols (bacteria, mold spores,
421        pollen and viruses) have been associated with allergic responses.
422    6.  Additional Information: Inquiries or requests for more information about asbestos and other hazardous substances can be
423        directed to the U.S. Environmental Protection Agency, Ariel Rios Building, 1200 Pennsylvania Ave., N.W., Washington, D.C.
424        20460, (202) 272-0167, and/or the Department of Health, Commonwealth of Pennsylvania, Division of Environmental Health,
425        Harrisburg, PA 17120. Information about indoor air quality issues is available through the Pennsylvania Department of Health
426        and may be obtained by contacting Health & Welfare Building, 8th Floor West, 625 Forster St., Harrisburg, PA 17120, or by
427        calling 1-877-724-3258.

**13. INSPECTION CONTINGENCY (10-18)**

428
429    (A)  The Contingency Period is _____ days (10 if not specified) from the Execution Date of this Agreement for each Inspection elected
430         in Paragraph 12(C).
431    (B)  **Within the stated Contingency Period** and as the result of any Inspection elected in Paragraph 12(C), except as stated in
432         Paragraph 12(C):
433         1.  If the results of the inspections elected in Paragraph 12(C) are satisfactory to Buyer, Buyer WILL present all Report(s) in
434             **their entirety to Seller, accept the Property with the information stated in the Report(s) and agree to the RELEASE in**
435             **Paragraph 28 of this Agreement, OR**
436         2.  If the results of any inspection elected in Paragraph 12(C) are unsatisfactory to Buyer, Buyer WILL present all Report(s) in
437             **their entirety to Seller and terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer**
438             according to the terms of Paragraph 26 of this Agreement, OR
439         3.  If the results of any inspection elected in Paragraph 12(C) are unsatisfactory to Buyer, Buyer WILL present all Report(s) in
440             **their entirety to Seller with a Written Corrective Proposal ("Proposal") listing corrections and/or credits desired by**
441             **Buyer.**
442             The Proposal may, but is not required to, include the name(s) of a properly licensed or qualified professional(s) to perform
443             the corrections requested in the Proposal, provisions for payment, including retests, and a projected date for completion of
444             the corrections. Buyer agrees that Seller will not be held liable for corrections that do not comply with mortgage lender or
445             governmental requirements if performed in a workmanlike manner according to the terms of Buyer's Proposal.
446         a.  Following the end of the Contingency Period, Buyer and Seller will have _____ days (5 if not specified) for a Negotiation
447             Period. During the Negotiation Period:
448             (1)  Seller will acknowledge in writing Seller's agreement to satisfy all the terms of Buyer's Proposal OR
449             (2)  Buyer and Seller will negotiate another mutually acceptable written agreement, providing for any repairs or improve-
450                  ments to the Property and/or any credit to Buyer at settlement, as acceptable to the mortgage lender, if any.
451         OR Seller agrees to satisfy all the terms of Buyer's Proposal, or Buyer and Seller enter into another mutually acceptable

452    Buyer Initials: _____    ASR Page 8 of 14    Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-54A1B8BE6A59

453 written agreement, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement and the
454 Negotiation Period ends.
455    b.  If no mutually acceptable written agreement is reached, or if Seller fails to respond, during the Negotiation Period, within
456       _____ days (2 if not specified) **following the end of the Negotiation Period,** Buyer will:
457       (1)  Accept the Property with the information stated in the Report(s) and agree to the RELEASE in Paragraph 28 of this
458           Agreement, OR
459       (2)  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms
460           of Paragraph 26 of this Agreement.
461       **If Buyer and Seller do not reach a mutually acceptable written agreement, and Buyer does not terminate this Agreement**
462       **by written notice to Seller within the time allotted in Paragraph 13(B)(3)(b), Buyer will accept the Property and agree**
463       **to the RELEASE in Paragraph 28 of this Agreement. Ongoing negotiations do not automatically extend the Negotiation**
464       **Period.**
465  (C) If a Report reveals the need to expand or replace the existing individual on-lot sewage disposal system, Seller may, within _____
466      days (25 if not specified) of receiving the Report, submit a Proposal to Buyer. The Proposal will include, but not be limited to,
467      the name of the company to perform the expansion or replacement; provisions for payment, including retests; and a projected
468      completion date for corrective measures. Within     5  DAYS of receiving Seller's Proposal, or **if no Proposal is provided within**
469      **the stated time,** Buyer will notify Seller in writing of Buyer's choice to:
470      1.  Agree to the terms of the Proposal, accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement, OR
471      2.  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
472         Paragraph 26 of this Agreement, OR
473      3.  Accept the Property and the existing system and agree to the RELEASE in Paragraph 28 of this Agreement. If required by
474         any mortgage lender and/or any governmental authority, Buyer will correct the defects before settlement or within the time
475         required by the mortgage lender and/or governmental authority, at Buyer's sole expense, with permission and access to the
476         Property given by Seller, which may not be unreasonably withheld. If Seller denies Buyer permission and/or access to correct
477         the defects, Buyer may, within    5  DAYS of Seller's denial, terminate this Agreement by written notice to Seller, with all
478         deposit monies returned to Buyer according to the terms of Paragraph 26 of this Agreement.
479      **If Buyer fails to respond** within the time stated in Paragraph 13(C) **or fails to terminate** this Agreement by written notice to
480      Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this Agreement.
481 **14.  TITLES, SURVEYS AND COSTS (6-20)**
482  (A) Within _____ days (7 if not specified) from the Execution Date of this Agreement, Buyer will order from a reputable title company
483      for delivery to Seller a comprehensive title report on the Property. Upon receipt, Buyer will deliver a free copy of the title report
484      to Seller.
485  (B) Buyer is encouraged to obtain an owner's title insurance policy to protect Buyer. An owner's title insurance policy is different
486      from a lender's title insurance policy, which will not protect Buyer from claims and attacks on the title. Owner's title insurance
487      policies come in standard and enhanced versions; **Buyer should consult with a title insurance agent about Buyer's options.**
488      Buyer agrees to release and discharge any and all claims and losses against Broker for Buyer should Buyer neglect to obtain an
489      owner's title insurance policy.
490  (C) Buyer will pay for the following: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for cancellation;
491      (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3) Appraisal fees
492      and charges paid in advance to mortgage lender; (4) Buyer's customary settlement costs and accruals.
493  (D) Any survey or surveys required by the title insurance company or the abstracting company for preparing an adequate legal descrip-
494      tion of the Property (or the correction thereof) will be obtained and paid for by Seller. Any survey or surveys desired by Buyer or
495      required by the mortgage lender will be obtained and paid for by Buyer.
496  (E) The Property will be conveyed with good and marketable title that is insurable by a reputable title insurance company at the reg-
497      ular rates, free and clear of all liens, encumbrances, and easements, **excepting however** the following: existing deed restrictions;
498      historic preservation restrictions or ordinances; building restrictions; ordinances; easements of roads; easements visible upon the
499      ground; easements of record; and privileges or rights of public service companies, if any.
500  (F) If a change in Seller's financial status affects Seller's ability to convey title to the Property on or before the Settlement Date, or
501      any extension thereof, Seller shall promptly notify Buyer in writing. A change in financial status includes, but is not limited to,
502      Seller filing bankruptcy; filing of a foreclosure lawsuit against the Property; entry of a monetary judgment against Seller; notice
503      of public tax sale affecting the Property; and Seller learning that the sale price of the Property is no longer sufficient to satisfy all
504      liens and encumbrances against the Property.
505  (G) If Seller is unable to give good and marketable title that is insurable by a reputable title insurance company at the regular rates,
506      as specified in Paragraph 14(E), Buyer may terminate this Agreement by written notice to Seller, with all deposit monies returned
507      to Buyer according to the terms of Paragraph 26 of this Agreement, or take such title as Seller can convey. If the title condition
508      precludes Seller from conveying title, Buyer's sole remedy shall be to terminate this Agreement. Upon termination, all deposit
509      monies shall be returned to Buyer according to the terms of Paragraph 26 of this Agreement and Seller will reimburse Buyer for
510      any costs incurred by Buyer for any inspections or certifications obtained according to the terms of this Agreement, and for those
511      items specified in Paragraph 14(C) items (1), (2), (3) and in Paragraph 14(D).
512  (H) Oil, gas, mineral, or other rights of this Property may have been previously conveyed or leased, and Sellers make no representation
513      about the status of those rights unless indicated elsewhere in this Agreement.
514      ☐ **Oil, Gas and Mineral Rights Addendum (PAR Form OGM)** is attached to and made part of this Agreement.

515   Buyer Initials: _____               **ASR Page 9 of 14**                  Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-5A4D385353E5

516    (I)    **COAL NOTICE (Where Applicable)**
517    THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDER-
518    NEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COM-
519    PLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND
520    ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of
521    the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence
522    resulting from coal mining operations, and that the property described herein may be protected from damage due to mine subsid-
523    ence by a private contract with the owners of the economic interests in the coal. This acknowledgement is made for the purpose
524    of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27,
525    1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.
526    (J)    The Property is not a "recreational cabin" as defined in the Pennsylvania Construction Code Act unless otherwise stated here:
527    _____
528    (K)    1.    This property is not subject to a Private Transfer Fee Obligation unless otherwise stated here: _____
529           ☐ **Private Transfer Fee Addendum (PAR Form PTF) is attached to and made part of this Agreement.**
530           2.    **Notices Regarding Private Transfer Fees:** In Pennsylvania, Private Transfer Fees are defined and regulated in the Private
531                 Transfer Fee Obligation Act (Act 1 of 2011; 68 Pa.C.S. §§ 8101, et. seq.), which defines a Private Transfer Fee as "a fee that
532                 is payable upon the transfer of an interest in real property, or payable for the right to make or accept the transfer, if the obli-
533                 gation to pay the fee or charge runs with title to the property or otherwise binds subsequent owners of property, regardless of
534                 whether the fee or charge is a fixed amount or is determined as a percentage of the value of the property, the purchase price or
535                 other consideration given for the transfer." A Private Transfer Fee must be properly recorded to be binding, and sellers must
536                 disclose the existence of the fees to prospective buyers. Where a Private Transfer Fee is not properly recorded or disclosed,
537                 the Act gives certain rights and protections to buyers.
538    **15. NOTICES, ASSESSMENTS AND MUNICIPAL REQUIREMENTS (9-18)**
539    (A)    In the event any notices of public and/or private assessments as described in Paragraph 10(F) (excluding assessed value) are
540           received after Seller has signed this Agreement and before settlement, Seller will within    5    DAYS of receiving the notices and/
541           or assessments provide a copy of the notices and/or assessments to Buyer and will notify Buyer in writing that Seller will:
542           1.    Fully comply with the notices and/or assessments, at Seller's expense, before settlement. If Seller fully complies with the
543                 notices and/or assessments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement, OR
544           2.    Not comply with the notices and/or assessments. If Seller chooses not to comply with the notices and/or assessments, or **fails**
545                 **within the stated time to notify Buyer whether Seller will comply**, Buyer will notify Seller in writing within    5    DAYS
546                 that Buyer will:
547                 a.    Comply with the notices and/or assessments at Buyer's expense, accept the Property, and agree to the RELEASE in
548                       Paragraph 28 of this Agreement, OR
549                 b.    Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
550                       Paragraph 26 of this Agreement.
551           **If Buyer fails to respond within the time stated in Paragraph 15(A)(2) or fails to terminate** this Agreement by written notice
552           to Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this Agreement.
553    (B)    If required by law, within    30    DAYS from the Execution Date of this Agreement, but in no case later than    15    DAYS prior
554           Settlement Date, Seller will order at Seller's expense a certification from the appropriate municipal department(s) disclosing notice
555           of any uncorrected violations of zoning, housing, building, safety or fire ordinances and/or a certificate permitting occupancy of
556           the Property. If Buyer receives a notice of any required repairs/improvements, Buyer will promptly deliver a copy of the notice to
557           Seller.
558           1.    Within    5    DAYS of receiving notice from the municipality that repairs/improvements are required, Seller will deliver a
559                 copy of the notice to Buyer and notify Buyer in writing that Seller will:
560                 a.    Make the required repairs/improvements to the satisfaction of the municipality. If Seller makes the required repairs/
561                       improvements, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement, OR
562                 b.    Not make the required repairs/improvements. If Seller chooses not to make the required repairs/improvements, Buyer will
563                       notify Seller in writing within    5    DAYS that Buyer will:
564                       (1)    Accept a temporary access certificate or temporary use and occupancy certificate, agree to the RELEASE in Paragraph
565                              28 of this Agreement and make the repairs at Buyer's expense after settlement, OR
566                       (2)    Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms
567                              of Paragraph 26 of this Agreement.
568                 **If Buyer fails to respond within the time stated in Paragraph 15(B)(1)(b) or fails to terminate** this Agreement by writ-
569                 ten notice to Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this
570                 Agreement, and **Buyer accepts the responsibility to perform the repairs/improvements** according to the terms of the
571                 notice provided by the municipality.
572           2.    If repairs/improvements are required and Seller fails to provide a copy of the notice to Buyer as required in this Paragraph,
573                 Seller will perform all repairs/improvements as required by the notice at Seller's expense. **Paragraph 15(B)(2) will survive**
574                 **settlement.**
575    **16. CONDOMINIUM/PLANNED COMMUNITY (HOMEOWNER ASSOCIATIONS) NOTICE (9-16)**
576    (A)    Property is NOT a Condominium or part of a Planned Community unless checked below.
577           ☐ **CONDOMINIUM.** The Property is a unit of a condominium that is primarily run by a unit owners' association. Section 3407
578                 of the Uniform Condominium Act of Pennsylvania requires Seller to furnish Buyer with a Certificate of Resale and copies of
579                 the condominium declaration (other than plats and plans), the bylaws and the rules and regulations of the association.
580    Buyer Initials: _____                    ASR Page 10 of 14                    Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-5E4ADEB6325F

581  ☐  PLANNED COMMUNITY (HOMEOWNER ASSOCIATION). The Property is part of a planned community as defined by
582      the Uniform Planned Community Act. Section 5407(a) of the Act requires Seller to furnish Buyer with a copy of the decla-
583      ration (other than plats and plans), the bylaws, the rules and regulations of the association, and a Certificate containing the
584      provisions set forth in Section 5407(a) of the Act.
585  (B)  **THE FOLLOWING APPLIES TO INITIAL SALES OF PROPERTIES THAT ARE PART OF A CONDOMINIUM**
586      **OR A PLANNED COMMUNITY:**
587      If this is the first sale of the property after creation of the condominium or planned community (therefore a sale by the Declarant),
588      Seller shall furnish Buyer with a Public Offering Statement no later than the date Buyer executes this Agreement. Buyer may void
589      this Agreement within 15 days (if a condominium) or within 7 days (if part of a planned community) after receipt of the Public
590      Offering Statement or any amendment to the Statement that materially and adversely affects Buyer. Upon Buyer declaring this
591      Agreement void, all deposit monies will be returned to Buyer according to the terms of Paragraph 26 of this Agreement.
592  (C)  **THE FOLLOWING APPLIES TO RESALES OF PROPERTIES THAT ARE PART OF A CONDOMINIUM OR A**
593      **PLANNED COMMUNITY:**
594      1.  Within ___15___ DAYS from the Execution Date of this Agreement, Seller, at Seller's expense, will request from the association
595          a Certificate of Resale and any other documents necessary to enable Seller to comply with the relevant Act. The Act provides
596          that the association is required to provide these documents within 10 days of Seller's request.
597      2.  Seller will promptly deliver to Buyer all documents received from the association. Under the Act, Seller is not liable to Buyer
598          for the failure of the association to provide the Certificate in a timely manner or for any incorrect information provided by the
599          association in the Certificate.
600      3.  The Act provides that Buyer may declare this Agreement VOID at any time before Buyer receives the association documents
601          and for 5 days after receipt, OR until settlement, whichever occurs first. Buyer's notice to Seller must be in writing; upon Buyer
602          declaring this Agreement void, all deposit monies will be returned to Buyer according to the terms of Paragraph 26 of this
603          Agreement.
604      4.  If the association has the right to buy the Property (right of first refusal), and the association exercises that right, Seller will
605          reimburse Buyer for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of the
606          Agreement, and any costs incurred by Buyer for: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for
607          cancellation; (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3)
608          Appraisal fees and charges paid in advance to mortgage lender.
609  **17. REAL ESTATE TAXES AND ASSESSED VALUE (4-14)**
610      In Pennsylvania, taxing authorities (school districts and municipalities) and property owners may appeal the assessed value of a prop-
611      erty at the time of sale, or at any time thereafter. A successful appeal by a taxing authority may result in a higher assessed value for
612      the property and an increase in property taxes. Also, periodic county-wide property reassessments may change the assessed value of
613      the property and result in a change in property tax.
614  **18. MAINTENANCE AND RISK OF LOSS (1-14)**
615      (A)  Seller will maintain the Property (including, but not limited to, structures, grounds, fixtures, appliances, and personal property)
616          specifically listed in this Agreement in its present condition, normal wear and tear excepted.
617      (B)  If any part of the Property included in the sale fails before settlement, Seller will:
618          1.  Repair or replace that part of the Property before settlement, OR
619          2.  Provide prompt written notice to Buyer of Seller's decision to:
620              a.  Credit Buyer at settlement for the fair market value of the failed part of the Property, as acceptable to the mortgage lender,
621                  if any, OR
622              b.  Not repair or replace the failed part of the Property, and not credit Buyer at settlement for the fair market value of the failed
623                  part of the Property.
624          3.  If Seller does not repair or replace the failed part of the Property or agree to credit Buyer for its fair market value, **or if Seller fails**
625              **to notify Buyer of Seller's choice,** Buyer will notify Seller in writing within ___5___ DAYS or before Settlement Date, whichever
626              is earlier, that Buyer will:
627              a.  Accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement, OR
628              b.  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
629                  Paragraph 26 of this Agreement.
630              **If Buyer fails to respond within the time stated in Paragraph 18(B)(3) or fails to terminate** this Agreement by written notice
631              to Seller within that time, **Buyer will accept the Property** and agree to the RELEASE in Paragraph 28 of this Agreement.
632      (C)  Seller bears the risk of loss from fire or other casualties until settlement. If any property included in this sale is destroyed and not
633          replaced prior to settlement, Buyer will:
634          1.  Accept the Property in its then current condition together with the proceeds of any insurance recovery obtainable by Seller, OR
635          2.  Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
636              Paragraph 26 of this Agreement.
637  **19. HOME WARRANTIES (1-10)**
638      At or before settlement, either party may purchase a home warranty for the Property from a third-party vendor. Buyer and Seller
639      understand that a home warranty for the Property does not alter any disclosure requirements of Seller, will not cover or warrant any
640      pre-existing defects of the Property, and will not alter, waive or extend any provisions of this Agreement regarding inspections or
641      certifications that Buyer has elected or waived as part of this Agreement. Buyer and Seller understand that a broker who recommends
642      a home warranty may have a business relationship with the home warranty company that provides a financial benefit to the broker.

643  Buyer Initials: _____        ASR Page 11 of 14        Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-EAE8EE2A55FA

644  **20. RECORDING (9-05)**
645       This Agreement will not be recorded in the Office of the Recorder of Deeds or in any other office or place of public record. If Buyer
646       causes or permits this Agreement to be recorded, Seller may elect to treat such act as a default of this Agreement.
647  **21. ASSIGNMENT (1-10)**
648       This Agreement is binding upon the parties, their heirs, personal representatives, guardians and successors, and to the extent assign-
649       able, on the assigns of the parties hereto. Buyer will not transfer or assign this Agreement without the written consent of Seller unless
650       otherwise stated in this Agreement. Assignment of this Agreement may result in additional transfer taxes.
651  **22. GOVERNING LAW, VENUE AND PERSONAL JURISDICTION (9-05)**
652       (A)  The validity and construction of this Agreement, and the rights and duties of the parties, will be governed in accordance with the
653            laws of the Commonwealth of Pennsylvania.
654       (B)  The parties agree that any dispute, controversy or claim arising under or in connection with this Agreement or its performance
655            by either party submitted to a court shall be filed exclusively by and in the state or federal courts sitting in the Commonwealth of
656            Pennsylvania.
657  **23. FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT OF 1980 (FIRPTA) (1-17)**
658       The disposition of a U.S. real property interest by a foreign person (the transferor) is subject to the Foreign Investment in Real Property
659       Tax Act of 1980 (FIRPTA) income tax withholding. FIRPTA authorized the United States to tax foreign persons on dispositions of U.S.
660       real property interests. This includes but is not limited to a sale or exchange, liquidation, redemption, gift, transfers, etc. Persons pur-
661       chasing U.S. real property interests (transferee) from foreign persons, certain purchasers' agents, and settlement officers are required
662       to withhold up to 15 percent of the amount realized (special rules for foreign corporations). Withholding is intended to ensure U.S.
663       taxation of gains realized on disposition of such interests. The transferee/Buyer is the withholding agent. If you are the transferee/
664       Buyer you must find out if the transferor is a foreign person as defined by the Act. If the transferor is a foreign person and you fail to
665       withhold, you may be held liable for the tax.
666  **24. NOTICE REGARDING CONVICTED SEX OFFENDERS (MEGAN'S LAW) (4-14)**
667       The Pennsylvania General Assembly has passed legislation (often referred to as "Megan's Law," 42 Pa.C.S. § 9791 et seq.) providing
668       for community notification of the presence of certain convicted sex offenders. **Buyers are encouraged to contact the municipal**
669       **police department or the Pennsylvania State Police** for information relating to the presence of sex offenders near a particular prop-
670       erty, or to check the information on the Pennsylvania State Police Web site at www.pamegenslaw.state.pa.us.
671  **25. REPRESENTATIONS (1-10)**
672       (A)  All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licens-
673            ees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement.
674            This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants,
675            representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. This Agreement will not
676            be altered, amended, changed or modified except in writing executed by the parties.
677       (B)  Unless otherwise stated in this Agreement, Buyer has inspected the Property (including fixtures and any personal property spe-
678            cifically listed herein) **before signing this Agreement or has waived the right to do so, and agrees to purchase the Property**
679            **IN ITS PRESENT CONDITION**, subject to inspection contingencies elected in this Agreement. Buyer acknowledges that
680            Brokers, their licensees, employees, officers or partners have not made an independent examination or determination of the
681            structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, nor of
682            conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the systems
683            contained therein.
684       (C)  Any repairs required by this Agreement will be completed in a workmanlike manner.
685       (D)  Broker(s) have provided or may provide services to assist unrepresented parties in complying with this Agreement.
686  **26. DEFAULT, TERMINATION AND RETURN OF DEPOSITS (1-18)**
687       (A)  Where Buyer terminates this Agreement pursuant to any right granted by this Agreement, Buyer will be entitled to a return of all
688            deposit monies paid on account of Purchase Price pursuant to the terms of Paragraph 26(B), and this Agreement will be VOID.
689            Termination of this Agreement may occur for other reasons giving rise to claims by Buyer and/or Seller for the deposit monies.
690       (B)  Regardless of the apparent entitlement to deposit monies, Pennsylvania law does not allow a Broker holding deposit monies to
691            determine who is entitled to the deposit monies when settlement does not occur. Broker can only release the deposit monies:
692            1.  If this Agreement is terminated prior to settlement and there is no dispute over entitlement to the deposit monies. A written
693                agreement signed by both parties is evidence that there is no dispute regarding deposit monies.
694            2.  If, after Broker has received deposit monies, Broker receives a written agreement that is signed by Buyer and Seller, directing
695                Broker how to distribute some or all of the deposit monies.
696            3.  According to the terms of a final order of court.
697            4.  According to the terms of a prior written agreement between Buyer and Seller that directs the Broker how to distribute the
698                deposit monies if there is a dispute between the parties that is not resolved. (See Paragraph 26(C))
699       (C)  Buyer and Seller agree that if there is a dispute over the entitlement to deposit monies that is unresolved _____ days (180 if not
700            specified) after the Settlement Date stated in Paragraph 4(A) (or any written extensions thereof) or following termination of the
701            Agreement, whichever is earlier, then the Broker holding the deposit monies will, within 30 days of receipt of Buyer's written
702            request, distribute the deposit monies to Buyer unless the Broker is in receipt of verifiable written notice that the dispute is the subject of
703            litigation or mediation. If Broker has received verifiable written notice of litigation or mediation prior to the receipt of Buyer's request
704            for distribution, Broker will continue to hold the deposit monies until receipt of a written distribution agreement between Buyer and
705            Seller or a final court order. Buyer and Seller are advised to initiate litigation or mediation for any portion of the deposit monies prior to
706            any distribution made by Broker pursuant to this paragraph. Buyer and Seller agree that the distribution of deposit monies based upon
707            the passage of time does not legally determine entitlement to deposit monies, and that the parties maintain their legal rights to pursue
708            litigation even after a distribution is made.

709  Buyer Initials: _____          ASR Page 12 of 14          Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-54A0EE63325F

710  (D) Buyer and Seller agree that a Broker who holds or distributes deposit monies pursuant to the terms of Paragraph 26 or Pennsylvania
711  law will not be liable. Buyer and Seller agree that if any Broker or affiliated licensee is named in litigation regarding deposit
712  monies, the attorneys' fees and costs of the Broker(s) and licensee(s) will be paid by the party naming them in litigation.

713  (E) Seller has the option of retaining all sums paid by Buyer, including the deposit monies, should Buyer:
714      1. Fail to make any additional payments as specified in Paragraph 2, OR
715      2. Furnish false or incomplete information to Seller, Broker(s), or any other party identified in this Agreement concerning Buyer's
716         legal or financial status, OR
717      3. Violate or fail to fulfill and perform any other terms or conditions of this Agreement.

718  (F) **Unless otherwise checked in Paragraph 26(G),** Seller may elect to retain those sums paid by Buyer, including deposit monies:
719      1. On account of purchase price, OR
720      2. As monies to be applied to Seller's damages, OR
721      3. As liquidated damages for such default.

722  (G) ☒ **SELLER IS LIMITED TO RETAINING SUMS PAID BY BUYER, INCLUDING DEPOSIT MONIES, AS LIQUI-**
723      **DATED DAMAGES.**

724  (H) If Seller retains all sums paid by Buyer, including deposit monies, as liquidated damages pursuant to Paragraph 26(F) or (G), Buyer
725      and Seller are released from further liability or obligation and this Agreement is VOID.

726  (I) Brokers and licensees are not responsible for unpaid deposits.

727  **27. MEDIATION (7-20)**
728  Buyer and Seller will submit all disputes or claims that arise from this Agreement, including disputes and claims over deposit monies,
729  to mediation. Mediation will be conducted in accordance with the Rules and Procedures of the Home Sellers/Home Buyers Dispute
730  Resolution System, unless it is not available, in which case Buyer and Seller will mediate according to the terms of the mediation sys-
731  tem offered or endorsed by the local Association of Realtors®. Mediation fees, contained in the mediator's fee schedule, will be divided
732  equally among the parties and will be paid before the mediation conference. Legal proceedings may be initiated prior to the comple-
733  tion of the mediation process to stop any statute of limitations from expiring and for the purpose of indexing a lis pendens by Buyer
734  to prevent the transfer of title to a third party when Buyer is seeking to purchase the Property. The parties agree that all proceedings
735  shall be stayed until the completion of mediation and that a court of competent jurisdiction may award attorneys' fees to the prevailing
736  party should the court find that a party has unreasonably breached this provision or acted in bad faith. Any agreement reached through
737  mediation and signed by the parties will be binding. Any agreement to mediate disputes or claims arising from this Agreement will
738  survive settlement.

739  **28. RELEASE (9-05)**
740  **Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any**
741  **OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or**
742  **through them, from any and all claims, losses or demands,** including, but not limited to, personal injury and property damage and
743  all of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-boring insects,
744  radon, lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the individual on-lot sewage
745  disposal system or deficiencies in the on-site water service system, or any defects or conditions on the Property. Should Seller be in
746  default under the terms of this Agreement or in violation of any Seller disclosure law or regulation, this release does not deprive Buyer
747  of any right to pursue any remedies that may be available under law or equity. This release will survive settlement.

748  **29. REAL ESTATE RECOVERY FUND (4-18)**
749  A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real
750  estate licensee (or a licensee's affiliates) owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been
751  unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-
752  3658.

753  **30. COMMUNICATIONS WITH BUYER AND/OR SELLER (1-10)**
754  (A) If Buyer is obtaining mortgage financing, Buyer shall promptly deliver to Broker for Buyer, if any, a copy of all Loan Estimate(s)
755      and Closing Disclosure(s) upon receipt.
756  (B) Wherever this Agreement contains a provision that requires or allows communication/delivery to a Buyer, that provision shall be
757      satisfied by communication/delivery to the Broker for Buyer, if any, **except for documents required to be delivered pursuant**
758      **to Paragraph 16.** If there is no Broker for Buyer, those provisions may be satisfied only by communication/delivery being made
759      directly to the Buyer, unless otherwise agreed to by the parties. Wherever this Agreement contains a provision that requires or
760      allows communication/delivery to a Seller, that provision shall be satisfied by communication/delivery to the Broker for Seller, if
761      any. If there is no Broker for Seller, those provisions may be satisfied only by communication/delivery being made directly to the
762      Seller, unless otherwise agreed to by the parties.

763  **31. HEADINGS (4-14)**
764  The section and paragraph headings in this Agreement are for convenience only and are not intended to indicate all of the matter in the
765  sections which follow them. They shall have no effect whatsoever in determining the rights, obligations or intent of the parties.

766  Buyer Initials: _GB_          ASR Page 13 of 14          Seller Initials: _____

DocuSign Envelope ID: C458E20D-C4A1-4097-913C-584ADEB63E5F

767 **32. SPECIAL CLAUSES (1-10)**
768     (A) **The following are attached to and made part of this Agreement if checked:**
769        ☐ Sale & Settlement of Other Property Contingency Addendum (PAR Form SSP)
770        ☐ Sale & Settlement of Other Property Contingency with Right to Continue Marketing Addendum (PAR Form SSPCM)
771        ☐ Sale & Settlement of Other Property Contingency with Timed Kickout Addendum (PAR Form SSPTKO)
772        ☐ Settlement of Other Property Contingency Addendum (PAR Form SOP)
773        ☐ Appraisal Contingency Addendum (PAR Form ACA)
774        ☐ Short Sale Addendum (PAR Form SHS)
775        ☒ **Closing - Heartland Abstract Pottstown PA**
776
777
778     (B) **Additional Terms:**
779
780
781
782
783
784
785
786
787
788
789
790
791
792
793
794 Buyer and Seller acknowledge receipt of a copy of this Agreement at the time of signing.

795 **This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and which counterparts**
796 **together shall constitute one and the same Agreement of the Parties.**

797 **NOTICE TO PARTIES: WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Parties to this transaction are
798 advised to consult a Pennsylvania real estate attorney before signing if they desire legal advice.

799 **Return** of this Agreement, and any addenda and amendments, including **return by electronic transmission**, bearing the signatures of all
800 parties, constitutes acceptance by the parties.

801     _____ Buyer has received the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336.

802     _____ Buyer has received a statement of Buyer's estimated closing costs before signing this Agreement.

803     _____ Buyer has received the Deposit Money Notice (for cooperative sales when Broker for Seller is holding deposit money)
804     before signing this Agreement.

805     _____ Buyer has received the Lead-Based Paint Hazards Disclosure, which is attached to this Agreement of Sale. Buyer has
806     received the pamphlet Protect Your Family from Lead in Your Home (for properties built prior to 1978).

8/11/2020 | 12:14 PM PDT

807 BUYER _____  DATE _____
      Paula Bickelman

808 BUYER _____  DATE _____

809 BUYER _____  DATE _____

810 Seller has received the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336.
811 Seller has received a statement of Seller's estimated closing costs before signing this Agreement.

812 SELLER _____  DATE _____
      Stephen Reichert

813 SELLER _____  DATE _____
      Deborah Reichert

814 SELLER _____  DATE _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

121 E 3rd St

DocuSign Envelope ID: B851C5A8-F996-49F0-BB96-CBFF737754M

**CHANGE IN TERMS ADDENDUM TO AGREEMENT OF SALE**        **CTA**

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

1   **PROPERTY** 122 E 3rd St, Pottstown, PA  19464-5280
2   **SELLER** Stephen Reichert, Deborah Reichert
3   **BUYER** Paula Bickelman

4   **The following terms of the Agreement of Sale are changed as stated below:**
5   **1.**   **REPAIRS**
6      Seller, at Seller's expense, will complete the following repairs no later than _____ days prior to Settlement Date (prior to
7      settlement, if not specified), in a workmanlike manner, with all required permits, according to the attached contractor's proposal(s),
8      if any, the terms of which, including the persons and specifications contained therein, shall become part of this Agreement:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

24   **2.**   **SELLER ASSIST**
25      Seller Assist is changed to $ _____ , or _____ % of the Purchase price, maximum, toward Buyer's costs as per-
26      mitted by the mortgage lender, if any. Seller is only obligated to pay up to the amount or percentage which is approved by mortgage
27      lender.

28   **3.**   **PURCHASE PRICE**
29      Purchase price is changed from $ _____ to $ _____ .

30   **4.**   **ACCEPTANCE & SETTLEMENT**
31      (A) Written acceptance of all parties will be on or before: _____
32      (B) Settlement Date is changed from _____ April 30, 2021 _____ to _____ June 30, 2021 _____

33   **5.**   **MORTGAGE TERMS**
34      (A) **Mortgage Type** is changed from _____ to _____
35      (B) **Mortgage amount**
36         1. First mortgage amount is changed from $ _____ to $ _____
37         2. Second mortgage amount is changed from $ _____ to $ _____
38      (C) **Mortgage Lender**
39         1. First mortgage lender is changed to _____
40         2. Second mortgage lender is changed to _____
41         3. Buyer will submit a completed, written mortgage application to the identified lender(s), if any, according to the terms of the
42          Mortgage Contingency paragraph of the Agreement of Sale on or before: _____
43      (D) **Loan-To-Value (LTV) ratio** (For conventional loans)
44        First mortgage LTV ratio not to exceed _____ %     Second mortgage LTV ratio not to exceed _____ %
45      (E) **Date for Buyer to deliver documentation** of lender's approval of Buyer's mortgage, whether conditional or outright, is
46        changed from _____ to _____

47   Buyer Initials:         CTA Page 1 of 2        Seller Initials: _____

Pennsylvania Association of Realtors®

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2020
rev. 3/20; rel. 3/20

EXP REALTY LLC, 168 W Ridge Pike #131 Limerick PA 19468        Phone: 6105799514      Fax: 6103402363      122 E 3rd St
Ralph and Karen Chiodo        Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

DocuSign Envelope ID: B851C5A8-F996-49F0-BB96-CBFF131/D411

| | | |
|---|---|---|
| 48 | **6.** | **TIME PERIODS** |
| 49 | (A) | The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____. |
| 50 | | The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____. |
| 51 | | The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____. |
| 52 | | The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____. |
| 53 | | The time period in paragraph _____, line _____ of Agreement of Sale is changed to _____. |
| 54 | (B) | The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____. |
| 55 | | The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____. |
| 56 | | The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____. |
| 57 | | The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____. |
| 58 | | The time period in paragraph _____, line _____ of the _____ Addendum is changed to _____. |

| | | |
|---|---|---|
| 59 | **7.** | **OTHER** |
| 60 | | _____ |
| 61 | | _____ |
| 62 | | _____ |
| 63 | | _____ |
| 64 | | _____ |
| 65 | | _____ |
| 66 | | _____ |
| 67 | | _____ |

68    **All other terms and conditions of the Agreement, including all other time periods, remain unchanged and in full force and effect.**

| | | | | |
|---|---|---|---|---|
| 69 | BUYER | _Paul Bic_ | Paula Bickelman | DATE 4/30/2021 | 6:51 AM PDT |
| 70 | BUYER | _____ | | DATE _____ |
| 71 | BUYER | _____ | | DATE _____ |
| 72 | SELLER | _____ | Stephen Reichert | DATE _____ |
| 73 | SELLER | _____ | Deborah Reichert | DATE _____ |
| 74 | SELLER | _____ | | DATE _____ |

**CTA Page 2 of 2**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    **122 E 3rd St**

# EXHIBIT B

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 19 of 91
Case 13-20063-jkf    Claim 12-1    Filed 05/21/14    Desc Main Document    Page 1 of 7

B 10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT **EASTERN** DISTRICT OF PENNSYLVANIA | | **PROOF OF CLAIM** |
|---|---|---|
| Name of Debtor<br>Deborah A. Reichert and Stephen J. Reichert | Case Number<br>13-20063 SR | |

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to1 U.S.C. § 503.*

| Name of Creditor *(The person or other entity to whom the debtor owes money or property)*<br>  Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc.,<br>  GreenPoint Mortgage Funding Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5 | |
|---|---|
| | **COURT USE ONLY** |
| Name and address where notices should be sent:<br>Chase Records Center<br>Attn: Correspondence Mail<br>Mail Code LA4-5555<br>700 Kansas Lane<br>Monroe, LA 71203<br><br>Telephone number: 1-866-243-5851 | ☐ Check this box if this claim amends a previously filed claim. **Court Claim Number:**_____ *(If known)*<br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br>JPMorgan Chase Bank, N.A.<br>3415 Vision Drive<br>OH4-7133<br>Columbus, OH 43219<br><br>Telephone number: 1-866-243-5851 | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

**1.  Amount of Claim as of Date Case Filed:$215,336.84**

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.

☒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:  Money Loaned**

| **3.  Last four digits of any number by which creditor identifies debtor:** 6769 | **3a. Debtor may have scheduled account as:** _____ | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☒Real Estate ☐Motor Vehicle ☐Other
Describe:  122 East 3rd Street Pottstown, PA 19464

Value of Property: $_____

Annual Interest Rate 3.625% ☐Fixed  or ■Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any: $74,498.59

Basis for perfection: Mortgage / Note

Amount of Secured Claim: $215,336.84

Amount Unsecured: $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

| ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).<br><br>☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use — 11 U.S.C. §507(a)(7). | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).<br><br>☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8). | ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).<br><br>☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). | **Amount entitled to priority:**<br>$_____ |
|---|---|---|---|

*Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 13-20063-jkf    Claim 12-1    Filed 05/21/14    Desc Main Document    Page 2 of 7
Exhibit A through D    Page 20 of 91

B 10 (Official Form 10) (04/13)

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with the claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.    ☐ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, Or their authorized agent (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Joshua I. Goldman, Esquire
Title:  Bankruptcy Attorney
Company:  KML Law Group, P.C., Attorneys for Secured Creditor
Address and telephone number (if different from notice address above):
Telephone number: 215-627-1322  email: jgoldman @kmllawgroup.com

/s/ Joshua I. Goldman, Esquire
(Signature)

May 21, 2014
(Date)

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

---

### INSTRUCTIONS FOR PROOF OF CLAIM FORM
*The instructions and definitions below are general explanations of the law.  In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address.  See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 21 of 91
Case 13-20063-jkf    Claim 12-1    Filed 05/21/14    Desc Main Document    Page 3 of 7

B 10 (Official Form 10) (04/13)

| DEFINITIONS | | INFORMATION |
|---|---|---|
| **Debtor**<br>A debtor is the person, corporation, or other entity that has filed a bankruptcy case.<br><br>**Creditor**<br>A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).<br><br>**Claim**<br>A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.<br><br>**Proof of Claim**<br>A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.<br><br>**Secured Claim Under 11 U.S.C. §506(a)**<br>A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. | A claim also may be secured if the creditor owes the debtor money (has a right to setoff).<br><br>**Unsecured Claim**<br>An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.<br><br>**Claim Entitled to Priority Under 11 U.S.C. §507(a)**<br>Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.<br><br>**Redacted**<br>A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.<br><br>**Evidence of Perfection**<br>Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded. | **Acknowledgment of Filing of Claim**<br>To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.<br><br>**Offers to Purchase a Claim**<br>Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court. |

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 22 of 91
Case 13-20063-jkf   Claim 12-1   Filed 05/21/14   Desc Main Document   Page 4 of 7

B 10 (Attachment A) (12/11)

## Mortgage Proof of Claim Attachment

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim.** See Bankruptcy Rule 3001(c)(2).

Name of debtor:   Stephen J. Reichert and Deborah A. Reichert      Case number:            13-20063 SR
Name of creditor:   Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5
 Last four digits of any number you
use to identify the debtor's account: 6769

---

### Part 1: Statement of Principal and Interest Due as of the Petition Date

Itemize the principal and interest due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on your Proof of Claim form).

1. Principal due (1)                                                                                      $153,592.40

2. Interest due

| Interest rate | From mm/dd/yyyy | To mm/dd/yyyy | Amount |
|---|---|---|---|
| 3.875% | 10/01/2010 | 03/31/2011 | $2,966.60 |
| 3.750% | 04/01/2011 | 02/29/2012 | $ 5,286.30 |
| 3.625% | 03/01/2012 | 11/17/2013 + | $ 9,561.75 |
| Total Interest due as of the petition date | | | $17,814.65   Copy total here ► (2) +   $17,814.65 |

3. Total principal and
interest due                                                                            (3)     $171,407.05

---

### Part 2: Statement of Prepetition Fees, Expenses, and Charges

Itemize the fees, expenses, and charges due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on the Proof of Claim form).

| Description | Dates incurred | | Amount |
|---|---|---|---|
| 1. Late charges | 05/17/2010 - $42.38; 10/13/2010; 11/16/2010; 12/16/2010; 01/18/2011; 02/16/2011; 03/16/2011 @ $40.09 each (Less Credit: 10/14/2010 - $40.09) | (1) | $ 242.83 |
| 2. Non-sufficient funds (NSF) fees | | (2) | $ _____ |
| 3. Attorney's fees | 01/15/2013 0 $520.00; 11/26/2013 - $260.00 | (3) | $ 780.00 |
| 4. Filing fees and court costs | 01/15/2013 - $258.00; 05/15/2013 - $69.00; 05/15/2013 - $121.00; 05/15/2013 - $150.00; 11/26/2013 - $15.25 | (4) | $ 613.25 |
| 5. Advertisement costs | | (5) | $ _____ |
| 6. Sheriff/auctioneer fees | | (6) | $ _____ |
| 7. Title costs | | (7) | $ _____ |
| 8. Recording fees | | (8) | $ _____ |
| 9. Appraisal/broker's price opinion fees | | (9) | $ _____ |
| 10. Property inspection fees | 05/05/2011; 12/07/2011; 02/17/2012; 02/25/2012; 03/22/2012; 05/11/2012; 06/01/2012; 06/30/2012; 07/19/2012; 08/21/2012; 09/25/2012; 10/30/2012; 11/28/2012; 01/08/2013; 02/05/2013; 03/07/2013; 04/03/2013 @ $14.00 each | (10) | $ 238.00 |
| 11. Tax advances (non-escrow) | | (11) | $ _____ |
| 12. Insurance advances (non-escrow) | | (12) | $ _____ |
| 13. Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | See Escrow Analysis attached | (13) | $ 40,630.34 |

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 13-20063-jkf    Claim 12-1    Filed 03/21/14    Desc Main Document    Page 5 of 7
Exhibit A through D    Page 23 of 93

| 14. **Property preservation expenses. Specify:** Yard Maintenance, Debris Removal and Winterizing | 07/21/2012 - $95.00; 08/03/2012 - $90.00; 08/10/2012 - $90.00; 11/28/2012 - $40.00; 11/28/2012 - $60.00; 11/28/2012 - $150.00; 11/28/2012 - $180.00; 11/28/2012 - $90.00; 12/05/2012 - $600.00; 01/08/2013 - $1,200.00 (Less Credit: 07/08/2013 - $53.68 ) | (14) | $ 2,541.32 |
|---|---|---|---|
| 15. **Other. Specify:** Service | 01/15/2013 - $69.00; 05/15/2013 - $100.00 | (15) | $ 169.00 |
| 16. **Other. Specify:** Preservation | 01/09/2013 | (16) | $ 40.00 |
| 17. **Other. Specify:**_____ | _____ | (17) | + $ _____ |
| 18. **Total prepetition fees, expenses, and charges. Add all of the amounts listed above.** | | (18) | $ 45,254.74 |

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 13-20063-jkf    Claim 12-1    Filed 05/21/14    Desc Main Document    Page 6 of 7
Exhibit A through D    Page 24 of 91

B 10 (Attachment A) (12/11)                                                                     Page 2

## Part 3. Statement of Amount Necessary to Cure Default as of the Petition Date

**Does the installment payment amount include an escrow deposit?**

☐   No

☒   Yes. Attach to the Proof of Claim form an escrow account statement prepared as of the petition date in a form consistent with
     applicable nonbankruptcy law.

| 1. | **Installment payments due** | Date last payment received by creditor | <u>10/14/2010</u> | |
| | | Number of installment payments due | (1) <u>37</u> | |
| 2. | **Amount of installment payments due** | 11 installments @ $801.77  11/10 – 09/11 | $ 8,819.47 | |
| | | 12 installments @ $791.11  10/11 – 09/12 | $ 9,493.32 | |
| | | 14 installments @ $780.79  10/12 – 11/13 | + $ 10,931.06 | |
| | | Total installment payments due as of the petition date | $ 29,243.85 | Copy total here ▶ (2) $ 29,243.85 |
| 3. | **Calculation of cure amount** | Add total prepetition fees, expenses, and charges | | Copy total from Part 2 here ▶ + $ 45,254.74 |
| | | Subtract total of unapplied funds (funds received but not credited to account) | | − $ _____ |
| | | Subtract amounts for which debtor is entitled to a refund | | − $ _____ |
| | | Total Amount necessary to cure default as of the petition date | | (3) $ 74,498.59 |

Copy total onto
Item 4 of Proof of
Claim form

## Post petition payment amount effective 12/01/2013 is $1,443.80

Basis for asserting that the applicable party has the right to foreclose: JPMorgan Chase Bank, N.A., services the loan on the property referenced
in this proof of claim. In the event the automatic stay in this case is lifted/set aside, this case dismisses, and/or the debtor obtains a discharge and a
foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of Wells Fargo Bank, National
Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR5, Mortgage Pass-
Through Certificates, Series 2005-AR5.

"Note-holder", directly or through an agent, has possession of the promissory note. The promissory note is either made payable to Note-holder or
has been duly endorsed.

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 25 of 91
Case 13-20063-jkf   Claim 12-1   Filed 05/21/14   Desc Main Document   Page 7 of 7

<u>IN THE UNITED STATES BANKRUPTCY COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

| | |
|---|---|
| Deborah A. Reichert<br>Stephen J. Reichert<br><br>            Debtors | CHAPTER 13<br><br>NO. 13-20063 SR   <u>Debtor(s)</u> |

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, attorney for Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5 do hereby certify that true and correct copies of the foregoing Proof of Claim have been served <u>May 21, 2014</u>, by electronic filing upon those listed below:

<u>Attorney for Debtors</u>
Scott F. Waterman,, Esq.
Iannello, Waterman & Muir, LLP
110 West Front Street
Media, PA 19063

<u>Bankruptcy Trustee</u>
Frederick L. Reigle Esq.
2901 St. Lawrence Avenue (VIA ECF)
P.O. Box 4010
Reading, PA 19606

Date: <u>May 21, 2014</u>

<u>/s/ Joshua I. Goldman, Esquire</u>
Joshua I. Goldman, Esquire
KML Law Group, P.C.
701 Market Street, Suite 5000
Philadelphia, PA 19106-1532
(215) 627-1322  FAX (215) 627-7734
Attorney for Movant/Applicant

**CHASE**

01237 Page 1 of 4
Customer Service Center          1-800-848-9136
Monday - Friday                  8 a.m. - 12 a.m.(ET)
Saturday                         8 a.m. - 8 p.m.(ET)
Hearing Impaired (TDD)           1-800-582-0542

01237 EWA Z 33013 C - ZE
STEPHEN J REICHERT
DEBORAH A REICHERT
1350 SHADY LANE
CHESTER SPRINGS PA 19425-2802

## Escrow: Taxes and Insurance Statement

| | |
|---|---|
| Loan Number | |
| Statement Date | 11/25/2013 |
| Review Period | 11/2013 to 11/2013 |
| Escrow Shortage | $0.00 |

### Important Message

If you are in bankruptcy or have been given a discharge for your bankruptcy, this letter is for information only. This letter is not an attempt to collect a debt. It is not an attempt to collect, assess or recover all or part of the debt from you. If a bankruptcy trustee is making your payments for you, please give a copy of this statement to the trustee.

Your escrow shortage amount does not include any actual shortage that might have been included before you filed for bankruptcy.

### Summary

Your escrow account is balanced.

### Monthly Home Loan Payment

| | Current Payment | New Payment Effective 12/01/2013 |
|---|---|---|
| Principal & Interest | $801.74 | $780.76 |
| Escrow Account Deposit | $0.03 | $663.04 |
| Total Payment Amount | $801.77 | $1,443.80 |

You have exactly the amount of money in your escrow account needed to pay your estimated property taxes and/or insurance for next year. Keep this statement for your records. You do not need to do anything else.

Your monthly payment will be $1,443.80 starting 12/01/13.

## Balancing Your Escrow Account

There needs to be enough money in your escrow account to pay your property taxes and/or insurance.  To do that, federal law allows us to require that you keep a minimum balance in your account. This cash reserve helps to cover any increase in taxes and/or insurance.  However, the minimum balance requirement has been waived for your account.

The payments made to and from your escrow account last year help predict your account activity for next year.  This year's activity also helps predict what your lowest account balance is likely to be.

To balance your escrow account, we compare what your lowest account balance will likely be next year with your minimum required balance. If there is no difference between the numbers, your escrow account is balanced.

| | |
|---|---|
| $0.00 | Your minimum required balance |
| $-40,630.34 | Your estimated lowest account balance for 2014[1] |
| **$0.00** | **Your escrow account is balanced** |

[1]See the "Estimated Escrow Account Activity" chart in this statement.

## Escrow Account History

The chart below compares this year's activity on your escrow account with our estimates. The estimated amounts came from your last escrow account review.

- Your most recent mortgage payment due was $801.77. Your mortgage payment includes principal and interest $801.74 and escrow money $0.03.
- At the time of your last escrow account review, your expected lowest balance was $0.00. The chart below shows that your actual lowest escrow balance was $-38,641.27.

Note: changes in property taxes or insurance premiums create the difference between the estimated and actual amounts in the chart. An "E" in the chart below means expected activity that hasn't occurred yet.

*Indicates a difference between the estimated and actual amounts.

### This Year: November 2013 to November 2013

| Date | Activity | Estimated Amount | Actual Amount | | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|---|
| | Starting Balance | | | | $1,326.03 | $-39,305.39 |
| 11/2013 | Deposit | $663.04 | $664.12 | E | $1,989.07 | $-38,641.27 |
| 12/2013 | Deposit | $663.04 | $0.00 | * | $2,652.11 | $0.00 |
| 01/2014 | Deposit | $663.04 | $0.00 | * | $3,315.15 | $0.00 |
| 02/2014 | Deposit | $663.04 | $0.00 | * | $3,978.19 | $0.00 |
| 03/2014 | Deposit | $663.04 | $0.00 | * | $4,641.23 | $0.00 |
| 04/2014 | Deposit | $663.04 | $0.00 | * | $4,969.27 | $0.00 |
| 04/2014 | Withdrawal - COUNTY TAX | $335.00 | $0.00 | * | | |
| 04/2014 | Withdrawal - BOROUGH TAX | $1,085.74 | $0.00 | * | $3,883.53 | $0.00 |
| 05/2014 | Deposit | $663.04 | $0.00 | * | $4,546.57 | $0.00 |
| 06/2014 | Deposit | $663.04 | $0.00 | * | $5,209.61 | $0.00 |
| 07/2014 | Deposit | $663.04 | $0.00 | * | $5,872.65 | $0.00 |
| 08/2014 | Deposit | $663.04 | $0.00 | * | | |
| 08/2014 | Withdrawal - SCHOOL TAX | $4,055.69 | $0.00 | * | $2,480.00 | $0.00 |
| 08/2014 | Withdrawal - HOMEOWNER IN | $2,480.00 | $0.00 | * | $0.00 | $0.00 |

**(Continued)**

**CHASE**

Page 2: Taxes and Insurance Statement

| | |
|---|---|
| Loan Number | |
| Statement Date | 11/25/2013 |
| Review Period | 11/2013 to 11/2013 |
| Escrow Shortage | $0.00 |

01237 EWA Z 33013 C - ZE
STEPHEN J REICHERT
DEBORAH A REICHERT
1350 SHADY LANE
CHESTER SPRINGS PA 19425-2802

### This Year: November 2013 to November 2013 (continued)

| Date | Activity | Estimated Amount | Actual Amount | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|
| 09/2014 | Deposit | $663.04 | $0.00 * | $663.04 | $0.00 |
| 10/2014 | Deposit | $663.04 | $0.00 * | $1,326.08 | $0.00 |
| | Total Deposits | $7,956.48 | $664.12 | | |
| | Total Withdrawals | $7,956.43 | $0.00 | | |
| | Account Balance as of 11/2013 | | | | -$38,641.27 |

### Expected Escrow Account Activity

The chart below estimates your escrow account balance for the next 12 months with your new monthly escrow account deposit of $663.04 and any anticipated withdrawals. The chart shows that you will reach your estimated lowest account balance of -$40,630.34 in August 2014 (highlighted below). That is equal to your minimum required balance of $0.00.

### Next Year: December 2013 to November 2014

| Date | Activity | Estimated Amount | Actual Amount | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|
| | Starting Balance | | | | -$38,641.27 |
| 12/2013 | Deposit | $663.04 | | -$37,978.23 | |
| 01/2014 | Deposit | $663.04 | | -$37,315.19 | |
| 02/2014 | Deposit | $663.04 | | -$36,652.15 | |
| 03/2014 | Deposit | $663.04 | | -$35,989.11 | |
| 04/2014 | Deposit Withdrawal - COUNTY TAX | $663.04 $335.00 | | -$35,661.07 | |
| 04/2014 | Withdrawal - BOROUGH TAX | $1,085.74 | | -$36,746.81 | |
| 05/2014 | Deposit | $663.04 | | -$36,083.77 | |
| 06/2014 | Deposit | $663.04 | | -$35,420.73 | |
| 07/2014 | Deposit | $663.04 | | -$34,757.69 | |
| 08/2014 | Deposit Withdrawal - SCHOOL TAX | $663.04 $4,055.69 | | -$38,150.34 | |
| 08/2014 | Withdrawal - HOMEOWNER IN | $2,480.00 | | -$40,630.34 | |
| 09/2014 | Deposit | $663.04 | | -$39,967.30 | |
| 10/2014 | Deposit | $663.04 | | -$39,304.26 | |
| 11/2014 | Deposit | $663.04 | | -$38,641.22 | |
| | Total Estimated Deposits | $7,956.48 | | | |
| | Total Estimated Withdrawals | $7,956.43 | | | |
| | Estimated Account Balance as of November 2014 | | | -$38,641.22 | |

### Expected Escrow Account Payments

This section reflects the escrow activity that is expected to occur in the next 12 months. The "Total Tax and Insurance Monthly Payment Amount" at the bottom of this chart is your new monthly escrow deposit, as listed on page 1 of this statement.

| Tax | | | Insurance | | |
|---|---|---|---|---|---|
| Item | Annual Expense | Anticipated Date(s) of Payment | Item | Annual Expense | Anticipated Date(s) of Payment |
| COUNTY TAX | $335.00 | April 14 | HOMEOWNER IN | $2,480.00 | August 14 |
| BOROUGH TAX | $1,085.74 | April 14 | | | |
| SCHOOL TAX | $4,055.69 | August 14 | | | |

**Total Tax and Insurance Monthly Payment Amount = $663.04**

**This Page Intentionally Left Blank**

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 13-20063-jkf    Claim 12-1 Part through Po5 Page1 30 of 91 Exhibit Note    Mortgage
and Assignment of Mortgage    Page 1 of 36

ORIGINAL

# ADJUSTABLE RATE NOTE
## (Monthly Treasury Average Index - Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED AND MY INTEREST RATE INCREASES ARE LIMITED.**

| | | |
|---|---|---|
| **August 29, 2005**<br>*[Date]* | **Exton**<br>*[City]* | **Pennsylvania**<br>*[State]* |

**122 E 3rd ST, Pottstown, PA 19464**
*[Property Address]*

**1.    BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $162,400.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **GreenPoint Mortgage Funding, Inc..**  I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**
(A)    Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.000%**. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
(B)    Interest Change Dates
The interest rate I will pay may change on the first day of **December, 2005**, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."
The new rate of interest will become effective on each Interest Change Date.
(C)    Interest Rate Limit
My interest rate will never be greater than **12.000%**.
(D)    The Index
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
(E)    Calculation of Interest Rate Changes
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 500/1000ths** percentage points (**3.500%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 31 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 2 of 36

one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

**3.    PAYMENTS**
(A)    Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the first day of each month beginning on October 1, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on September 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at P.O. Box 908, Newark, NJ 07101-0908 or at a different place if required by the Note Holder.
(B)    Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $684.69. This amount may change.
(C)    Payment Change Dates
My monthly payment may change as required by Section 3(D) below beginning on the 1st day of October, 2006, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.
I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.
(D)    Calculation of Monthly Payment Changes
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.
(E)    Additions to My Unpaid Principal
My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.
(F)    Limit on My Unpaid Principal; Increased Monthly Payment
My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.
(G)    Required Full Payment
On October 1, 2010 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4.    NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 32 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 3 of 36

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)    Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B)    Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)    Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)    No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)    Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person, who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 33 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 4 of 36

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____   (Seal)
Steven J Reichert                -Borrower
Stephen

_____   (Seal)
Deborah A Reichert               -Borrower

_____   (Seal)
                                 -Borrower

_____   (Seal)
                                 -Borrower

*[Sign Original Only]*

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 34 of 91
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage
and Assignment of Mortgage   Page 5 of 36

WITHOUT RECOURSE
PAY TO THE ORDER OF:

GreenPoint Mortgage Funding, Inc.

Thomas K. Mitchell
Vice President

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 35 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 6 of 36

# PREPAYMENT FEE ALLONGE

This Prepayment Fee Allonge ("Allonge") is made this 29th day of August, 2005, and is incorporated into and intended to form a part of the note dated the same date as this Allonge (Note) and also amends and supplements the mortgage, deed of trust, security deed, or security instrument (the "Security Instrument") dated the same date as this Allonge and the Note. To the extent that the provisions of this Allonge are inconsistent with the provisions of the Note and/or the Security Instrument, the provisions of this Allonge shall prevail over and will supercede any inconsistent provisions of the Note and/or the Security Instrument.

The section of the Note entitled **Borrower's Right to Prepay** is amended by adding the following paragraph as the last paragraph of such section:

If I make a Prepayment within 3 year(s) of the date of this Note, I will pay a Prepayment fee on the aggregate Prepayments made within any consecutive twelve month period which exceed 20% of the original Principal amount stated in the Note. The Prepayment fee I will pay shall be an amount equal to six (6) months advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the twelve (12) month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original principal amount of this Note. I will not be obligated to pay a Prepayment fee if I make a full Prepayment at any time after the 3rd anniversary of the date of this Note. In no event will such a charge be made if it violates state or federal law.

No Prepayment penalty will be assessed if prepayment is concurrent with the sale of the property securing the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Steven J Reichert                  -Borrower

_____ (Seal)
Deborah A Reichert                 -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

*[Sign Original Only]*

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
Exhibit A through D Page 36 of 91
and Assignment of Mortgage    Page 7 of 36

2005131174    09/14/2005 01:45:03 PM:2
RCD FEE: $126.50

MG-MORTGAGE

MONTGOMERY
COUNTY ROD

NANCY BECKER ROD

Prepared By:  First Land Transfer, LLC
Return To:    First Land Transfer, LLC
              ATTN: Erica L. Werner
              100 Campbell Boulevard, Exton, Pennsylvania 19341
              610-363-4304

MG-MORTGAGE

2005131174   09/14/2005 01:45:03 PM:2
RCD FEE $126.50

MONTGOMERY
COUNTY ROD

NANCY BECKER ROD

Prepared By: First Land Transfer, LLC
Return To:      First Land Transfer, LLC
                ATTN: Erica L. Werner
                100 Campbell Boulevard, Exton, Pennsylvania  19341
                610-363-4304

## MORTGAGE - File No. FLT216-742

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 38 of 91
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage
and Assignment of Mortgage   Page 9 of 36

After recording please return to:

GreenPoint Mortgage Funding, Inc.
*[Company Name]*

*[Name of Natural Person]*

981 Airway Court, Suite E
*[Street Address]*

Santa Rosa, CA, 95403-2049
*[City, State  Zip Code]*

```
MONTGOMERY COUNTY COMMISSIONERS REGISTRY
16·00·29244·00·8  POTTSTOWN
122 E THIRD ST
POTPINKO PAUL L JR & KATY
B 026  U 032 (        1132  DATE: 09/09/05
```

―――――――――――――  *[Space Above This Line For Recording Data]*  ―――――――――――――

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "Security Instrument" means this document, which is dated August 29, 2005, together with all Riders to this document.

(B)     "Borrower" is ~~Steve J~~ Stephen Reichert and ~~Debbie A~~ Deborah Reichert, Husband And Wife
. Borrower is the mortgagor under this Security Instrument.

(C)     "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)     "Lender" is GreenPoint Mortgage Funding, Inc..Lender is a Corporation organized and existing under the laws of the State of New York.  Lender's address is 100 Wood Hollow Drive, Novato, CA 94945.

(E)     "Note" means the promissory note signed by Borrower and dated August 29, 2005.  The Note states that Borrower owes Lender   One Hundred Sixty Two Thousand Four Hundred   and 00/100ths Dollars (U.S. $162,400.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than September 1, 2035.

(F)     "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)     "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

―――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――

Pennsylvania Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                     Page 1 of 15
www.compliancesource.com

MERS Modified Form 3039 01/01
14301PA  08/00 Rev. 09/03
©2003, The Compliance Source, Inc.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 39 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 10 of 36

**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

☒ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☒ 1-4 Family Rider ☐ Revocable Trust Rider
☐ Other(s) *[specify]*

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "Escrow Items" means those items that are described in Section 3.

**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 40 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 11 of 36

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the County                     of Montgomery                                        :
_____[Type of Recording Jurisdiction]_____        _____[Name of Recording Jurisdiction]_____

Tax Parcel ID No.: 16-00-29244-008
   SEE DEED LEGAL

which currently has the address of 122 E 3rd ST
                                                                                    [Street]
Pottstown                                    , Pennsylvania 19464                    ("Property Address")
           [City]                                                    [Zip Code]

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

   UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check,

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 41 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 12 of 36

File No. FLT216-742

## EXHIBIT A

ALL THAT CERTAIN brick messuage or tenement and lot or piece of land, Situate in the Ninth Ward of the Borough of Pottstown, Montgomery County, PA on the South side of Third Street, between York and Hanover Streets, being known as No. 122 East Third Street bounded and described as follows, to wit;

BEGINNING at a point, the Southeast corner of Third and McClellan Streets; thence along the East side of McClellan Street, formerly Alley, Southwardly 140 feet to the North side of a 20 feet wide private alley; thence by the same, Eastwardly 50 feet 8 inches to a corner of this and land now or late of Emma S. Erb; thence by the same, Northwardly 140 feet to the South side of Third Street, aforesaid; thence by the same, Westwardly 48 feet 9 inches to the place of Beginning.

Being Tax Parcel Number 16-00-29244-00-8

BEING the same premises which Paul L. Potpinko, Jr., by Indenture dated March 15, 2004 and recorded in the Recorder of Deeds, in and for the County of Montgomery, aforesaid, in Deed Book 5512 page 1040 &c., granted and conveyed unto Paul L. Potpinko, Jr. and Katy Potpinko, husband and wife, in fee.

BEING Parcel No. 16-00-29244-008.

Parcel No. 16-00-29244-008

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 42 of 91
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage
and Assignment of Mortgage   Page 13 of 36

bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender, and if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 43 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 14 of 36

time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.**    Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.**    Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or

Case 19-12484-amc  Doc 194-2  Filed 06/25/21  Entered 06/25/21 15:24:01  Desc
Exhibit A through D   Page 44 of 91
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage
and Assignment of Mortgage   Page 15 of 36

similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether

Pennsylvania Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    Page 6 of 15
www.compliancesource.com

MERS Modified Form 3039 01/01
14301PA 08/00 Rev. 09/03
©2003, The Compliance Source, Inc.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 45 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 16 of 36

or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.    **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 46 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 17 of 36

non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount

Pennsylvania Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 8 of 15
MERS Modified Form 3039 01/01
14301PA 08/00 Rev. 09/03

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 47 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 18 of 36

of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assume Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Pennsylvania Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 9 of 15

MERS Modified Form 3039 01/01
14301PA 08/00 Rev. 09/03
©2003, The Compliance Source, Inc.

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Case 13-20063-jkf   ClaimExhibit 4 through D05 Page 148 of 21 Exhibit Note   Mortgage
and Assignment of Mortgage   Page 19 of 36

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

Pennsylvania Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 10 of 15

MERS Modified Form 3039  01/01
14301PA 08/00 Rev. 09/03
©2003, The Compliance Source, Inc.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 13-20063-jkf    Claim Exhibit Part 1 through 05 Page 49 of 91 Exhibit Note    Mortgage
and Assignment of Mortgage    Page 20 of 36

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

_[Signatures on Following Page]_

Pennsylvania Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 15

MERS Modified Form 3039  01/01
14301PA 08/00 Rev. 09/03
©2003 The Compliance Source, Inc.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 52 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 23 of 36

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Steven J Reichert                                          -Borrower
                                                                  [Printed Name]

_____ (Seal)
Deborah A Reichert                                        -Borrower
                                                                  [Printed Name]

_____ (Seal)
                                                                  -Borrower
                                                                  [Printed Name]

_____ (Seal)
                                                                  -Borrower
                                                                  [Printed Name]

Certificate of Residence:

I/We do hereby certify that the precise address of the within named mortgagee is 100 Wood Hollow Drive, Novato, CA 94945

_____
Agent of Mortgagee

_____ [Acknowledgment on Following Page] _____

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/13   Desc Exhibit Note   Mortgage
Exhibit A through D   Page 53 of 91
and Assignment of Mortgage   Page 24 of 36

State of _PA_                         §
County of _Chester_                   §
                                      §

On this, the _29_ day of _August_ _2005_ ,
before me _Erica L. Werner_
the undersigned officer, personally appeared
~~Steven J Reichert and Deborah A Reichert~~
_Stephen_ ~~JS~~

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument,
and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

Signature _Erica L. Werner_

(Seal)

Title of Officer

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ERICA L. WERNER, Notary Public
Downingtown Boro., Chester County
My Commission Expires July 24, 2007

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 54 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 25 of 36

# ADJUSTABLE RATE RIDER
## (Monthly Treasury Average Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 29th day of August, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to GreenPoint Mortgage Funding, Inc. (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**122 E 3rd ST, Pottstown, PA 19464**
*[Property Address]*

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE BORROWER'S MONTHLY PAYMENT INCREASES MAY BE LIMITED AND THE INTEREST RATE INCREASES ARE LIMITED.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.    INTEREST
(A)    Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 3.000%. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.
(B)    Interest Change Dates
The interest rate I will pay may change on the first day of December, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family—Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                    Page 1 of 4                    Modified Form 3112
                                                                    Modified By GreenPoint Mortgage Funding 11946R6MII 06/05

August 25, 2005

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 55 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 26 of 36

The new rate of interest will become effective on each Interest Change Date.

(C)    Interest Rate Limit

My interest rate will never be greater than 12.000%.

(D)    The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(E)    Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding  Three and 500/1000ths percentage points (3.500%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

3.    PAYMENTS

(A)    Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on October 1, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on September 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 908, Newark, NJ 07101-0908 or at a different place if required by the Note Holder.

(B)    Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $684.69. This amount may change.

(C)    Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of October, 2006, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)    Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family—Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                                         Page 2 of 4                              Modified Form 3112
                                                                          Modified By GreenPoint Mortgage Funding H94686MU 06/05

August 25, 2005

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 56 of 91
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage
and Assignment of Mortgage   Page 27 of 36

preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

(E)   Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

(F)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

(G)   Required Full Payment

On   October 1, 2010 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                         Page 3 of 4                         Modified Form 3112
                                                                      Modified By GreenPoint Mortgage Funding H94686MU 06/05

August 25, 2005

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 57 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 28 of 36

continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Steven J Reichert            -Borrower
Stephen

_____ (Seal)
Deborah A Reichert          -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

[Sign Only]        Original

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding          Page 4 of 4          Modified Form 3112
                    Modified By GreenPoint Mortgage Funding H94686MU 06/05

August 25, 2005

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 58 of 91
Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage
and Assignment of Mortgage   Page 29 of 36

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 29th day of August, 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to GreenPoint Mortgage Funding, Inc.

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

122 E 3rd ST, Pottstown, PA 19464

*[Property Address]*

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 59 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 30 of 36

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

---

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 60 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 31 of 36

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

    **I.   CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)    _____ (Seal)
Steven J Reichert   -Borrower      Deborah A Reichert   -Borrower

_____ (Seal)    _____ (Seal)
   -Borrower                             -Borrower

*[Sign Original Only]*



Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 61 of 91
02/17/2012  08:38:10 AM   Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage   MONTCO
and Assignment of Mortgage   Page 32 of 36

McCube Weisberg & Conway, P.C.
Suite 2080
123 South Broad Street
Philadelphia, PA 19109
Record and Return To: Pamela Miller

McCube Weisberg & Conway, P.C.
Suite 2080
123 South Broad Street
Philadelphia, PA 19109
Attn: Daniel Doherty

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
16-00-29244-00-8   POTTSTOWN BOROUGH
122 E THIRD ST
REICHERT STEPHEN J & DEBORAH A                    $10.00
B 026  L  U 032  1132 02/17/2012                      JU

### Assignment of Mortgage

For value received, the undersigned holder of a mortgage, Mortgage Electronic Registration Systems, Inc., as nominee for GreenPoint Mortgage Funding, Inc, its successors and assigns, whose address is P.O. Box 2026, Flint, Michigan 48501-2026, grants, sells, assigns, transfers and conveys without warranties and without recourse, unto Wells Fargo Bank, National Association as Trustee for the Certificate holders of Structured Asset Mortgage Investments II Inc., GreenPoint MTA Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5, whose address is 420 Motgomery Street, San Francisco, California 94104, said mortgage having been executed by Stephen J. Reichert and Deborah A. Reichert with a secure payment of $162,400.00, recorded in Book Number: 11583, Page: 1849 Instrument No. 2005131174 of the Recorder of Deeds for Montgomery County, Commonwealth of Pennsylvania and recorded on September 14, 2005, and all rights accrued or to accrue under said Mortgage.

Property is located in Montgomery County, Commonwealth of Pennsylvania, and has the address of 122 East 3rd Street, Pottstown, Pennsylvania 19464, along with the following legal description:

SEE ATTACHED LEGAL DESCRIPTION
Parcel No. 16-00-29244-00-8

Assignee certifies that the precise address of Wells Fargo Bank, National Association as Trustee for the Certificate holders of Structured Asset Mortgage Investments II Inc., GreenPoint MTA Trust 2005-AR5, Mortgage Pass-Through Certificates, Series 2005-AR5, is 420 Motgomery Street, San Francisco, California 94104.

Attested by: _Sypuena Moran_
             _Cynthia Moran_

TO HAVE AND TO HOLD, Assignee, its successors and assigns, subject only to the terms and conditions of the above-described Mortgage.

MAR 3 0 2012
FILED

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 63 of 91

02/17/2012 08:38:10 AM    Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage    MONTCO
and Assignment of Mortgage    Page 34 of 36

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on

_January 18_ , _2012_

Mortgage Electronic Registration Systems, Inc.

Signature: _Danisha A. Hampton_

Title: _Vice President_

Date: _1/18/12_

## FORM OF CORPORATE ACKNOWLEDGMENT

State of _Louisiana_ )

County of _Ouachita Parish_    ) SS:

On this _18th_ day of _January_ , 2012 before me the undersigned officer, personally appeared _Danisha A. Hampton_ who acknowledged himself or herself to be the _Vice President_ of Mortgage Electronic Registration Systems, Inc., as nominee for GreenPoint Mortgage Funding, Inc., and that he or she as such _officer_ , being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself or herself as _Vice President_ .

In witness whereof, I here unto set my hand and official seal.

_Norma Woodall_
NOTARY PUBLIC _Norma Woodall_

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 64 of 91
02/17/2012 08:38:10 AM   Case 13-20063-jkf   Claim 12-1 Part 3   Filed 05/21/14   Desc Exhibit Note   Mortgage   MONTCO
and Assignment of Mortgage   Page 35 of 36

## EXHIBIT A

ALL THAT CERTAIN brick messuage or tenement and lot or piece of land, Situate in the Ninth Ward of the Borough of Pottstown, Montgomery County, PA on the South side of Third Street, between York and Hanover Streets, being known as No. 122 East Third Street bounded and described as follows, to wit;

BEGINNING at a point, the Southeast corner of Third and McClellan Streets; thence along the East side of McClellan Street, formerly Alley, Southwardly 140 feet to the North side of a 20 feet wide private alley; thence by the same, Eastwardly 50 feet 8 inches to a corner of this and land now or late of Emma S. Erb; thence by the same, Northwardly 140 feet to the South side of Third Street, aforesaid; thence by the same, Westwardly 48 feet 9 inches to the place of Beginning.

Being Tax Parcel Number 16-00-29244-00-8

BEING the same premises which Paul L. Potpinko, Jr., by Indenture dated March 15, 2004 and recorded in the Recorder of Deeds, in and for the County of Montgomery, aforesaid, in Deed Book 5512 page 1040 &c., granted and conveyed unto Paul L. Potpinko, Jr. and Katy Potpinko, husband and wife, in fee.

BEING Parcel No. 16-00-29244-008.

Parcel No. 16-00-29244-008

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 65 of 91
Case 13-20063-jkf    Claim 12-1 Part 3    Filed 05/21/14    Desc Exhibit Note    Mortgage
and Assignment of Mortgage    Page 36 of 36

 

MTG BK 13253 PG 01197 to 01200
INSTRUMENT # : 2012016122
RECORDED DATE: 02/17/2012 08:38:10 AM

**RECORDER OF DEEDS**
MONTGOMERY COUNTY
*Nancy J. Becker*

One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
Office: (610) 278-3289 ~ Fax: (610) 278-3869

MONTGOMERY COUNTY ROD

| OFFICIAL RECORDING COVER PAGE | | Page 1 of 4 |
|---|---|---|

| | | |
|---|---|---|
| Document Type: Mortgage Assignment | Transaction #: | 2611743 - 1 Doc(s) |
| Document Date: 01/18/2012 | Document Page Count: | 3 |
| Reference Info: | Operator Id: | thordije |
| RETURN TO: (Simplifile)<br>McCabe, Weisberg & Conway, P.C.<br>123 South Broad Street, Suite 2080<br>Philadelphia, PA 19109<br>(215) 790-1010 | PAID BY:<br>MCCABE WEISBERG & CONWAY PC | |

**\* PROPERTY DATA:**
| | | |
|---|---|---|
| Parcel ID #: | 16-00-29244-00-8 | |
| Address: | 122 E THIRD ST | |
| | POTTSTOWN PA<br>19464 | |
| Municipality: | Pottstown Borough (100%) | |
| School District: | Pottstown | |

**\* ASSOCIATED DOCUMENT(S):**
MTG BK 11583 PG 01849

| FEES / TAXES: | | MTG BK 13253 PG 01197 to 01200 |
|---|---|---|
| Recording Fee:Mortgage Assignment | $54.00 | Recorded Date: 02/17/2012 08:38:10 AM |
| Additional Names Fee | $1.50 | |
| Rejected Document Fee | $5.00 | I hereby CERTIFY that |
| Total: | $60.50 | this document is |

I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office in Montgomery County, Pennsylvania.

Nancy J. Becker
Recorder of Deeds

# PLEASE DO NOT DETACH
## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always supersedes.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 66 of 91
Case 2:20-cv-06353-MMB    Document 7    Filed 03/15/21    Page 1 of 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN ANANIA, | : | CIVIL ACTION |
| | : | |
| *Plaintiff* | : | |
| v. | : | NO. 20-06353 (MMB) |
| | : | |
| GARY SCHROEDER and LAURA SCHROEDER, | : | |
| | : | |
| *Defendants* | : | |
| | : | |

**ANSWER TO THE COMPLAINT
WITH AFFIRMATIVE DEFENSES**

Defendants, Gary Schroeder ("Mr. Schroeder") and Laura Schroeder ("Ms. Schroeder") (collectively, "the Schroeders"), and their undersigned attorneys, Stevens & Lee, responding to the Complaint filed by Plaintiff, Stephen Anania ("Plaintiff"), file their Answer to the Complaint with Affirmative Defenses, and state as follows:

**INTRODUCTION**

The initial paragraph of Plaintiff's Complaint is an introductory statement to which no response is required. If and to the extent that a further response may be required, the allegations in the introduction are admitted in part and denied in part. It is solely admitted that Plaintiff brings this action against the Schroeders for claims asserted under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq., and the Pennsylvania Wage Payment and Collection Law of 1961 ("WPCL"), as amended, 43 P.S. § 206.1, et seq. However, the remaining allegations in the introductory statement state conclusions of law to which no response is required. If and to the extent that a further response may be required, said remaining allegations are denied.

1

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 67 of 91
Case 2:20-cv-06353-MMB    Document 7    Filed 03/15/21    Page 2 of 15

## PARTIES

1.      The allegations in Paragraph 1 are admitted in part and denied in part.  It is solely admitted that Plaintiff is an individual and former employee of Oakshire Mushroom Farm, Inc. ("Oakshire").  However, the Schroeders lacks sufficient knowledge or information after reasonable investigation to form a belief about the truth of the remaining allegations in Paragraph 1, and therefore, the remaining allegations are denied.

2.      The allegations in Paragraph 2 are admitted.

3.      The allegations in Paragraph 3 are admitted.

## JURISDICTION AND VENUE

4.      The allegations in Paragraph 4 state conclusions of law to which no response is required.  By way of further response, the Schroeders do not dispute that this Court has subject matter jurisdiction over Plaintiff's federal law claims.

5.      The allegations in Paragraph 5 state conclusions of law to which no response is required.

6.      The allegations in Paragraph 6 state conclusions of law to which no response is required.  By way of further response, the Schroeders do not dispute that venue is properly laid in this judicial district.

## GENERAL ALLEGATIONS

7.      The allegations of Paragraph 7 are admitted.

8.      The allegations of Paragraph 8 are admitted.

9.      The allegations of Paragraph 9 are admitted.

2

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Case 2:20-cv-06353-MMB    Document 7    Filed 03/05/21    Page 3 of 15
Exhibit A through R    Page 03 of 15

10.     The allegations in Paragraph 10 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

11.     The allegations in Paragraph 11 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

12.     The allegations in Paragraph 12 state conclusions of law to which no response is required.

13.     The allegations in Paragraph 13 state conclusions of law to which no response is required.  If and to the extent that a further response may be required, the allegations are denied.

14.     The allegations in Paragraph 14 state conclusions of law to which no response is required.

15.     The allegations in Paragraph 15 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

16.     The allegations in Paragraph 16 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

17.     The allegations in Paragraph 17 are admitted.

18.     The allegations in Paragraph 18 are admitted.

19.     The allegations in Paragraph 19 are admitted.

20.     The allegations in Paragraph 20 are admitted in part and denied in part.  It is solely admitted that Mr. Schroeder did not notify Plaintiff that there was to be any reduction in matching

3

contributions.    However,  the  Schroeders  lacks  sufficient  knowledge  or  information  after

reasonable investigation to form a belief about the truth of the remaining allegations in Paragraph

20, and therefore, the remaining allegations are denied.

 21. The allegations in Paragraph 21 are admitted.

 22. The allegations in Paragraph 22 are admitted in part and denied in part.  It is solely

admitted that in 2018 Plaintiff deferred $350 per paycheck to his IRA from approximately January

2, 2018, until approximately August 10, 2018.  However, the remaining allegations are denied.

 23. The allegations in Paragraph 23 are admitted.

 24. The allegations in Paragraph 24 are admitted.

 25. The allegations in Paragraph 25 are admitted.

 26. The allegations in Paragraph 26 are admitted.

 27. The allegations in Paragraph 27 are admitted.

 28. The allegations in Paragraph 28 are admitted.

 29. The allegations in Paragraph 29 are admitted.

 30. The allegations in Paragraph 30 are admitted.

 31. The allegations in Paragraph 31 are admitted.

 32. The allegations in Paragraph 32 are denied.

 33. The  Schroeders  lack  sufficient  knowledge  or  information  after  reasonable

investigation to form a belief about the truth of the allegations in Paragraph 33, and therefore, the

allegations are denied.

 34. The allegations in Paragraph 34 are denied.

 35. The allegations in Paragraph 35 are denied.

 36. The allegations in Paragraph 36 are denied.

4

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 70 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/15/21   Page 5 of 15

37.    The allegations in Paragraph 37 are denied.  By way of further response, it is specifically denied that Mr. Schroeder received emails from Plaintiff questioning employee contributions and/or matching funds.

38.    The Schroeders lack sufficient knowledge or information after reasonable investigation to form a belief about the truth of the allegations in Paragraph 38, and therefore, the allegations are denied.

39.    The Schroeders lack sufficient knowledge or information after reasonable investigation to form a belief about the truth of the allegations in Paragraph 39, and therefore, the allegations are denied.

40.    The Schroeders lack sufficient knowledge or information after reasonable investigation to form a belief about the truth of the allegations in Paragraph 40, and therefore, the allegations are denied.

41.    The allegations in Paragraph 41 are denied.

42.    The allegations in Paragraph 42 are denied.

43.    The allegations in Paragraph 43 state conclusions of law to which no response is required.  If and to the extent that a further response may be required, the allegations are denied.

44.    The allegations in Paragraph 44 are denied.

45.    The allegations in Paragraph 45 are denied.

46.    The allegations in Paragraph 46 are denied.

47.    The allegations in Paragraph 47 are denied.

48.    The allegations in Paragraph 48 are denied as stated.  By way of further response, Mr. Schroeder was one of several individuals who had check signing authority for Oakshire.

49.    The allegations in Paragraph 49 are denied.

5

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 71 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/25/21   Page 6 of 15

50.     The allegations in Paragraph 50 are denied.

51.     The allegations in Paragraph 51 are denied.

52.     The allegations in Paragraph 52 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

53.     The allegations in Paragraph 53 are denied.

54.     The allegations in Paragraph 54 are denied.

55.     The allegations in Paragraph 55 are denied.

56.     The allegations in Paragraph 56 are denied.

57.     The allegations in Paragraph 57 are denied.

58.     The allegations in Paragraph 58 are incomprehensible, and therefore, are denied.

59.     The allegations in Paragraph 59 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

60.     The allegations in Paragraph 60 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

61.     The allegations in Paragraph 61 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

62.     The allegations in Paragraph 62 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

63.     The allegations in Paragraph 63 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

6

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 72 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/15/21   Page 7 of 15

64.     The allegations in Paragraph 64 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

## COUNT I

65.     The Schroeders incorporate their prior responses to the foregoing Paragraphs of the Complaint, as if they were fully set forth at length herein.

66.     The allegations in Paragraph 66 are admitted.

67.     The allegations in Paragraph 67 are admitted.

68.     The allegations in Paragraph 68 state conclusions of law to which no response is required.

69.     The allegations in Paragraph 69 are admitted.

70.     The allegations in Paragraph 70 are admitted.

71.     The allegations in Paragraph 71 are admitted.

72.     The allegations in Paragraph 72 are admitted.

73.     The allegations in Paragraph 73 are admitted.

74.     The allegations in Paragraph 74 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

75.     The allegations in Paragraph 75 state conclusions of law to which no response is required.

76.     The allegations in Paragraph 76 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

77.     The allegations in Paragraph 77 are admitted.

78.     The allegations in Paragraph 78 are admitted.

79.     The allegations in Paragraph 79 are denied.

SL1 1680611v1 115331.00001

Case 19-12484-amc    Doc 194-2    Filed 06/25/21    Entered 06/25/21 15:24:01    Desc
Exhibit A through D    Page 73 of 91
Case 2:20-cv-06353-MMB    Document 7    Filed 03/15/21    Page 8 of 15

80.    The allegations in Paragraph 80 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

81.    The allegations in Paragraph 81 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

82.    The allegations in Paragraph 82 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

83.    The allegations in Paragraph 83 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

## COUNT II

84.    The Schroeders incorporate their prior responses to the foregoing Paragraphs of the Complaint, as if they were fully set forth at length herein.

85.    The allegations in Paragraph 85 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

86.    The allegations in Paragraph 86 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

87.    The allegations in Paragraph 87 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

88.    The allegations in Paragraph 88 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

89.    The allegations in Paragraph 89 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

8

90. The allegations in Paragraph 90 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

91. The allegations in Paragraph 91 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

92. The allegations in Paragraph 92 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

93. The allegations in Paragraph 93 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

94. The allegations in Paragraph 94 are admitted.

95. The allegations in Paragraph 95 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

96. The allegations in Paragraph 96 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

97. The allegations in Paragraph 97 are admitted.

98. The allegations in Paragraph 98 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

99. The allegations in Paragraph 99 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

100. The allegations in Paragraph 100 are admitted.

9

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 75 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/15/21   Page 10 of 15

101.   The allegations in Paragraph 101 relate to a document that speaks for itself and is the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize that document are denied.

102.   The allegations in Paragraph 102 are denied.

103.   The allegations in Paragraph 103 are denied.

104.   The allegations in Paragraph 104 relate to documents that speak for themselves and are the best evidence of what is contained therein; therefore, any attempt by Plaintiff to characterize, interpret, or summarize these documents is denied.

105.   The allegations in Paragraph 105 are admitted.

106.   The allegations in Paragraph 106 are denied.

107.   The allegations in Paragraph 107 are denied.

108.   The allegations in Paragraph 108 state conclusions of law to which no response is required.  If and to the extent that a further response may be required, the allegations are denied.

## COUNT III

109.   The Schroeders incorporate their prior responses to the foregoing Paragraphs of the Complaint, as if they were fully set forth at length herein.

110.   The allegations in Paragraph 110 are admitted in part and denied in part.  It is solely admitted that Mr. Schroeder is currently the President of Oakshire.  However, it is denied that Mr. Schroeder has been the President of Oakshire at all relevant times.

111.   The allegations in Paragraph 111 are admitted.

112.   The allegations in Paragraph 112 are admitted.

113.   The allegations in Paragraph 113 are admitted.

SL1 1680611v1 115331.00001

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 76 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/15/21   Page 11 of 15

114.    The allegations in Paragraph 114 are admitted in part and denied in part. It is solely admitted that Mr. Schroeder negotiated with Plaintiff regarding Plaintiff's salary and benefits when Plaintiff was initially hired by Oakshire in or about 1995. However, it is denied that Mr. Schroeder negotiated with Plaintiff regarding Plaintiff's salary and benefits at all relevant times.

115.    The allegations in Paragraph 115 are denied.

116.    The allegations in Paragraph 116 are denied.

117.    The allegations in Paragraph 117 are admitted in part and denied in part. It is solely admitted that Mr. Schroeder had the power to hire Plaintiff when Plaintiff was initially hired by Oakshire in or about 1995. However, it is denied that Mr. Schroeder had the power to hire Plaintiff at all relevant times.

118.    The allegations in Paragraph 118 are denied.

119.    The allegations in Paragraph 119 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

120.    The allegations in Paragraph 120 are denied.

121.    The allegations in Paragraph 121 are denied.

122.    The allegations in Paragraph 122 are denied.

123.    The allegations in Paragraph 123 are admitted.

124.    The allegations in Paragraph 124 are denied.

125.    The allegations in Paragraph 125 are admitted in part and denied in part. It is solely admitted that Mr. Schroeder did not notify Plaintiff of any setoff. However, the Schroeders lacks sufficient knowledge or information after reasonable investigation to form a belief about the truth of the remaining allegations in Paragraph 125, and therefore, the remaining allegations are denied.

11

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 77 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/15/21   Page 12 of 15

126.    The allegations in Paragraph 126 state conclusions of law to which no response is required.

127.    The allegations in Paragraph 127 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

128.    The allegations in Paragraph 128 are admitted.

129.    The allegations in Paragraph 129 are denied.

130.    The allegations in Paragraph 130 are denied.

131.    The allegations in Paragraph 131 state conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations are denied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff's Prayer for Relief states conclusions of law to which no response is required. If and to the extent that a further response may be required, the allegations in Plaintiff's Prayer for Relief are denied because Plaintiff is not entitled to any relief in this action. By way of further response, the Schroeders respectfully request that this Court enter judgment in their favor and against Plaintiff, together with costs of litigation, attorneys' fees, and any other relief that the Court deems just and appropriate under the circumstances.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief might be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff is barred from receiving a double recovery to the extent that the relief he seeks in this action is the same relief he seeks in connection with the Proof of Claim he filed on or about

12

March 2, 2019, in the related matter of <u>In Re Oakshire Mushroom Farm, Inc.</u>, 18-18446-ELF,

which is pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's state law claims asserted under the WPCL are federally preempted by ERISA.

See <u>McMahon v. McDowell</u>, 794 F.2d 100 (3d Cir. 1986).

### FOURTH AFFIRMATIVE DEFENSE

The Schroeders did not cause Oakshire's Simple Retirement Plan to engage in a prohibited

transaction under Section 406 of ERISA, 29 U.S.C. §1106, with a party in interest.

### FIFTH AFFIRMATIVE DEFENSE

The Schroeders did not breach an ERISA-imposed duty.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or may be barred, in whole or in part, by the applicable statute

of limitations.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or may be barred, in whole or in part, by the doctrines of

estoppel, waiver, release, laches, and/or unclean hands.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff suffered no injuries or damages as a result of any act or omission of the Schroeders

as alleged in the Complaint.

### NINTH AFFIRMATIVE DEFENSE

The Schroeders reserve their right to supplement their affirmative defenses up to and

including at the time of trial based upon such other facts, circumstances, or principles of law as

may be made available through discovery and trial in this matter.

SL1 1680611v1 115331.00001

Case 19-12484-amc   Doc 194-2   Filed 06/25/21   Entered 06/25/21 15:24:01   Desc
Exhibit A through D   Page 79 of 91
Case 2:20-cv-06353-MMB   Document 7   Filed 03/15/21   Page 14 of 15

## PRAYER FOR RELIEF

WHEREFORE, the Schroeders respectfully request that this Court enter judgment in their

favor and against Plaintiff, together with costs of litigation, attorneys' fees, and any other relief

that the Court deems just and appropriate under the circumstances.

Respectfully submitted,

STEVENS & LEE

Dated: March 15, 2021

By: /s/ Wade D. Albert
    Daniel J. Sobol
    Wade D. Albert

    1500 Market Street
    East Tower, Suite 1800
    Philadelphia, PA 19102
    Tel.   (215) 751-2873
    Fax   (610) 371-7937
    djso@stevenslee.com
    wda@stevenslee.com

    *Attorneys for Defendants*

14

## CERTIFICATE OF SERVICE

I, Wade D. Albert, hereby certify that the foregoing Defendant's Answer to the Complaint

with Affirmative Defenses was electronically filed on this date; it is available for viewing and

downloading on the Court's CM/ECF system; and it has been served on the following via the

Court's CM/ECF system as well as via email:

> Karen E. Eichman, Esquire
> EICHMAN LAW, PLLC
> 8 Federal Road. Suite 3
> West Grove, PA 19390
> kareneichman@eichmanlawgroup.com

STEVENS & LEE

Dated: March 15, 2021          By: /s/ Wade D. Albert
                                   Wade D. Albert

                                   1500 Market Street
                                   East Tower, Suite 1800
                                   Philadelphia, PA 19102
                                   Tel.  (215) 751-2873
                                   Fax  (610) 371-7937
                                   wda@stevenslee.com

                                   *Attorneys for Defendants*

15

## Robert Greenbaum

| | |
|---|---|
| **From:** | Gary Schroeder <gary.schroeder@oakshire.com> |
| **Sent:** | Monday, March 15, 2021 10:12 AM |
| **To:** | Thomas Bielli; Robert Greenbaum |
| **Subject:** | FW: Answer to Complaint |
| **Attachments:** | 2021-03-15 - Doc 07 - Dfts Answer to Compl with Aff. Defs[2].pdf |

Tom, Rob,

FYI, the Anania Answer to Complaint was filed this morning by Stevens & Lee.

I asked them to hold off on any further activity until after Wednesday's Confirmation Hearing.


Gary

Gary Schroeder

---

**From:** Gary Schroeder <gary.schroeder@oakshire.com>
**Date:** Monday, March 15, 2021 at 10:08 AM
**To:** "Albert, Wade D." <WDA@stevenslee.com>
**Cc:** "Sobol, Daniel J." <DJSO@stevenslee.com>
**Subject:** Re: Draft Answer to Complaint

The Chapter 11 confirmation hearing is Wednesday March 17 at 11:00 AM.  Since it is only 48 hours away, let's wait until after noon Wednesday for any further actions on our part.  Then we can be as aggressive as needed.


Gary

Gary Schroeder

---

**From:** "Albert, Wade D." <WDA@stevenslee.com>
**Date:** Monday, March 15, 2021 at 10:03 AM
**To:** Gary Schroeder <gary.schroeder@oakshire.com>
**Cc:** "Sobol, Daniel J." <DJSO@stevenslee.com>
**Subject:** RE: Draft Answer to Complaint


Here it is.  See attached.

Should we hold off on doing anything else until the confirmation hearing?

**Wade D. Albert** | STEVENS & LEE
A Stevens & Lee/Griffin Company
1500 Market Street | East Tower | Suite 1800 | Philadelphia, PA  19102
Phone: 215-751-2873 | Internal:  4724 | Fax: 610-371-7937

1

wda@stevenslee.com | www.stevenslee.com

**From:** Gary Schroeder <gary.schroeder@oakshire.com>
**Sent:** Monday, March 15, 2021 9:45 AM
**To:** Albert, Wade D. <WDA@stevenslee.com>
**Subject:** Re: Draft Answer to Complaint

Thanks Wade.


Gary

Gary Schroeder

**From:** "Albert, Wade D." <WDA@stevenslee.com>
**Date:** Monday, March 15, 2021 at 9:44 AM
**To:** Gary Schroeder <gary.schroeder@oakshire.com>
**Cc:** "Sobol, Daniel J." <DJSO@stevenslee.com>
**Subject:** RE: Draft Answer to Complaint


Thanks Gary.  I'm glad to hear that no objections were filed.

The Answer is ready to go and I plan on filing it this morning.  I'll send you copy after it's filed.

**Wade D. Albert** | STEVENS & LEE
A Stevens & Lee/Griffin Company
1500 Market Street | East Tower | Suite 1800 | Philadelphia, PA  19102
Phone: 215-751-2873 | Internal:  4724 | Fax: 610-371-7937
wda@stevenslee.com | www.stevenslee.com

**From:** Gary Schroeder <gary.schroeder@oakshire.com>
**Sent:** Monday, March 15, 2021 9:39 AM
**To:** Albert, Wade D. <WDA@stevenslee.com>
**Subject:** Re: Draft Answer to Complaint

Wade,

A quick reminder our response needs filed today.

FYI, the Chapter 11 Reorganization Plan object date (Friday) passed with no objections filed.  We are on track for a positive outcome at the Confirmation hearing Wednesday this week.

Thank you.


Gary

Gary Schroeder

2

**From:** "Albert, Wade D." <WDA@stevenslee.com>
**Date:** Thursday, March 11, 2021 at 5:25 PM
**To:** Gary Schroeder <Gary.Schroeder@oakshire.com>
**Cc:** "Sobol, Daniel J." <DJSO@stevenslee.com>
**Subject:** RE: Draft Answer to Complaint


Gary – Thanks so much.  I definitely understand there is a lot more detail behind the denials in the answer.  As we discussed, I will hold off until 3/15 to file the answer.

Hopefully we can quickly resolve the case and put it to bed.

I'll send you a time-stamped copy of the answer after I file.

In the meantime, let me know if you have any questions or concerns.

**Wade D. Albert | STEVENS & LEE**
A Stevens & Lee/Griffin Company
1500 Market Street | East Tower | Suite 1800 | Philadelphia, PA  19102
Phone: 215-751-2873 | Internal:  4724 | Fax: 610-371-7937
wda@stevenslee.com | www.stevenslee.com

**From:** Gary Schroeder <Gary.Schroeder@oakshire.com>
**Sent:** Thursday, March 11, 2021 9:35 AM
**To:** Albert, Wade D. <WDA@stevenslee.com>
**Cc:** Sobol, Daniel J. <DJSO@stevenslee.com>
**Subject:** Re: Draft Answer to Complaint

Wade,

I have read your Answer to the Complaint and do not have any edits to suggest.  I shared the background with you on the phone and your formal response is consistent.  As you know there is more detail behind the simple denial of specific accusations which I have shared with you.  More detail can be shared if it becomes relevant.

As discussed on the phone, please wait until March 15 to file this.

Our goal remains to settle this claim at face value with no added funds gong to plaintiff.

Thanks for jumping on this.

Gary

Gary Schroeder

**From:** "Albert, Wade D." <WDA@stevenslee.com>
**Date:** Tuesday, March 9, 2021 at 5:58 PM
**To:** Gary Schroeder <Gary.Schroeder@oakshire.com>
**Cc:** "Sobol, Daniel J." <DJSO@stevenslee.com>
**Subject:** Draft Answer to Complaint

Gary,

I hope you're doing well.  Attached please find a draft Answer to the Complaint with Affirmative Defenses that we prepared.  Also attached is a copy of the Complaint for comparison purposes.

We were able to deny a number of paragraphs of the Complaint based on information you provided that you were not in control of the day-to-day finances of the company for most of the relevant time period.  We also were able to deny some paragraphs of the Complaint that alleged certain amounts due that do not much similar allegations made in Anania's Proof of Claim filed in the bankruptcy proceeding.

Can you review this draft Answer and let me know if anything is not factually accurate, or if you think any changes should be made.

We are on track to file this Answer on 3/15.  In the meantime, let me know if you have any questions or concerns.

Best,

**Wade D. Albert** | STEVENS & LEE
A Stevens & Lee/Griffin Company
1500 Market Street | East Tower | Suite 1800 | Philadelphia, PA  19102
Phone: 215-751-2873 | Internal:  4724 | Fax: 610-371-7937
wda@stevenslee.com | www.stevenslee.com

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

# EXHIBIT C




**SAT BK 1643 PG 01520 to 01522**
INSTRUMENT # : 2020035280
RECORDED DATE: 05/18/2020 10:54:18 AM



5765117-0019Z

RECORDER OF DEEDS
MONTGOMERY COUNTY
*Jeanne Sorg*

One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
Office: (610) 278-3289 ~ Fax: (610) 278-3869

**MONTGOMERY COUNTY ROD**

| **OFFICIAL RECORDING COVER PAGE** | | Page 1 of 3 |
|---|---|---|
| **Document Type:** Satisfaction of Mortgage | **Transaction #:** | 6044557 - 2 Doc(s) |
| **Document Date:** 02/20/2020 | **Document Page Count:** | 2 |
| **Reference Info:** | **Operator Id:** | dkrasley |
| **RETURN TO:** (Simplifile) | **PAID BY:** | |
| First American Mortgage Solutions | FIRST AMERICAN MORTGAGE SOLUTIONS | |
| 3 FIRST AMERICAN WAY | | |
| SANTA ANA, CA 92707 | | |
| (817) 961-2308 | | |

**\* PROPERTY DATA:**

Parcel ID #:      16-00-29244-00-8
Address:          122 E THIRD ST

                  POTTSTOWN PA
                  19464
Municipality:     Pottstown Borough (100%)
School District:  Pottstown

**\* ASSOCIATED DOCUMENT(S):**
MTG BK 11583 PG 01849                    POA BK 0265 PG 00547

| **FEES / TAXES:** | | SAT BK 1643 PG 01520 to 01522 |
|---|---|---|
| Recording Fee:SAT | $80.75 | Recorded Date: 05/18/2020 10:54:18 AM |
| **Total:** | $80.75 | I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office in Montgomery County, Pennsylvania. |



**Jeanne Sorg**
**Recorder of Deeds**

Rev1 2016-01-29

# PLEASE DO NOT DETACH
## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT
NOTE: If document data differs from cover sheet, document data always supersedes.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION

05/18/2020 10:54:18 AM          SAT  BK 1643  PG 01521                          MONTCO

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
16-00-29244-00-8    POTTSTOWN BOROUGH
122 E THIRD ST
REICHERT STEPHEN J & DEBORAH A                    $15.00
B 026  L  U 032  1132 05/11/2020                      JG

PARCEL NO. 16-00-29244-00-8
**PENNSYLVANIA**
COUNTY OF MONTGOMERY
LOAN NO.: 0017209800

WHEN RECORDED MAIL TO:
FIRST AMERICAN MORTGAGE SOLUTIONS, 1795 INTERNATIONAL WAY, IDAHO FALLS, ID 83402, PH. 208-528-9895

# SATISFACTION OF MORTGAGE

The undersigned, **WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., GREENPOINT MORTGAGE FUNDING TRUST 2005-AR5, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-AR5**, located at C/O **SELECT PORTFOLIO SERVICING, INC. 3217 S. DECKER LAKE DR., SALT LAKE CITY, UT 84119**, the Mortgagee of that certain Mortgage described below, does hereby release and reconvey to the persons legally entitled thereto, all of its right, title, and interest in and to the real estate described in said Mortgage, forever satisfying, releasing, canceling, and discharging the lien from said Mortgage.

Said Mortgage dated **AUGUST 29, 2005** in the original amount of **$162,400.00** executed by **STEPHEN J REICHERT AND DEBORAH A REICHERT, HUSBAND AND WIFE**, Mortgagor, to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR GREENPOINT MORTGAGE FUNDING, INC., ITS SUCCESSORS AND ASSIGNS**, Original Mortgagee, and duly recorded on **SEPTEMBER 14, 2005** in Book 11583 at Page 1849 as Document No. 2005131174 in the Office of the Register, Recorder, or County Clerk of **MONTGOMERY** County, State of **PENNSYLVANIA**, more particularly described and commonly known as:

LEGAL DESCRIPTION: **AS DESCRIBED IN SAID MORTGAGE**
PROPERTY ADDRESS: **122 E 3RD STREET, POTTSTOWN, PA 19464**
**BOROUGH OF POTTSTOWN**

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on **FEBRUARY 20, 2020.**
**WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., GREENPOINT MORTGAGE FUNDING TRUST 2005-AR5, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-AR5, BY SELECT PORTFOLIO SERVICING, INC. AS ATTORNEY IN FACT**

KRISTIN H. CARL, ASSISTANT SECRETARY

POD: 20170808                    Page 1 of 2
SP8100114IM - LR - PA

MIN: 100013800875552560
MERS PHONE: 1-888-679-6377

05/18/2020  10:54:18 AM

STATE OF **IDAHO**                COUNTY OF **BONNEVILLE**        ) ss.

On **FEBRUARY 20, 2020**, before me, **ASHLEY RYDALCH**, personally appeared **KRISTIN H. CARL** known to me to be the **ASSISTANT SECRETARY** of **SELECT PORTFOLIO SERVICING, INC. AS ATTORNEY-IN-FACT FOR WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., GREENPOINT MORTGAGE FUNDING TRUST 2005-AR5, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-AR5** the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

**ASHLEY RYDALCH (COMMISSION EXP. 03/29/2025)**
NOTARY PUBLIC

ASHLEY RYDALCH
Notary Public · State of Idaho
Commission Number 20190781
My Commission Expires Mar 29, 2025

**SP8100114JM - LR - PA**          **Page 2 of 2**
LOAN NO. 0017209800

# EXHIBIT D

1. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 07/17/2012 in Case No. 2012-19189 in the amount of $903.24

2. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 07/17/2012 in Case No. 2012-19307 in the amount of $807.18

3. MUNICIPAL LIEN in favor of Pottstown Borough Authority and Pottstown Borough on 01/25/2013, in Case No. 2013-01849 in the amount of $1,746.12. (Judgment Entered against Stephen J. Reichert and Deborah A. Reichert on 12/28/2015 in the amount of $2,714.33, plus interest and cost)

4. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 03/01/2013 in Case No. 2013-04719 in the amount of $1,139.32

5. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 05/20/2013 in Case No. 2013-12438 in the amount of $940.99

6. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 08/22/2013 in Case No. 2013-26508 in the amount of $933.74

7. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 12/03/2013 in Case No. 2013-34764 in the amount of $933.74

8. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 01/06/2014 in Case No. 2014-00347 in the amount of $604.85

9. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 01/27/2014 in Case No. 2014-02331 in the amount of $553.93

10. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 04/25/2014 in Case No. 2014-09389 in the amount of $568.93

11. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 04/02/2015 in Case No. 2015-07349 in the amount of $790.56

12. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 06/03/2015 in Case No. 2015-12362 in the amount of $790.56

13. MUNICIPAL LIEN filed by Pottstown Borough on 11/10/2015 in Case No. 2015-29658 in the amount of $2,149.79

14. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 04/20/2016 in Case No. 2016-08029 in the amount of $2,499.31

15. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 02/06/2017 in Case No. 2017-02491 in the amount of $619.61

16. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 03/03/2017 in Case No. 2017-04436 in the amount of $2,092.55

17. MUNICIPAL LIEN filed by Borough of Pottstown on 05/22/2017 in Case No. 2017-10333 in the amount of $718.70.

18. MUNICIPAL LIEN filed by Montgomery County Tax Claim Bureau on 05/09/2018 in Case No. 2018-10399 in the amount of $611.47

19. MUNICIPAL LIEN filed by Borough of Pottstown on 05/21/2018 in Case No. 2018-13478 in the amount of $1,067.82

20. MUNICIPAL LIEN filed by Pottstown School District on 05/23/2018 in Case No. 2018-14077 in the amount of $5,095.71

21. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 06/27/2018 in Case No. 2018-16910 in the amount of $933.60

22. MUNICIPAL LIEN filed by Pottstown Borough on 08/07/2018 in Case No. 2018-20027 in the amount of $1,707.12

23. MUNICIPAL LIEN filed by Montgomery County Tax Claim Bureau on 05/01/2019 in Case No. 2019-09468 in the amount of $610.23

24. MUNICIPAL LIEN filed by Borough of Pottstown on 05/09/2019 in Case No. 2019-12174 in the amount of $1,183.43

25. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 06/06/2019 in Case No. 2019-14993 in the amount of $4,051.08

26. MUNICIPAL LIEN filed by Pottstown Borough on 06/11/2019 in Case No. 2019-15244 in the amount of $1,862.28

27. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 07/03/2019 in Case No. 2019-18036 in the amount of $553.78

28. MUNICIPAL LIEN filed by Pottstown School District on 07/03/2019 in Case No. 2019-18044 in the amount of $5,084.86

29. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 01/10/2020 in Case No. 2020-00536 in the amount of $1,080.76

20. MUNICIPAL LIEN filed by Pottstown Borough on 02/28/2020 in Case No. 2020-03778 in the amount of $1,618.60

21. MUNICIPAL LIEN filed by Pottstown Borough Authority and Pottstown Borough on 02/28/2020 in Case No. 2020-03782 in the amount of $555.98

22. MUNICIPAL LIEN filed by Montgomery County Tax Claim Bureau on 06/16/2020 in Case No. 2020-08327 in the amount of $577.67

23. MUNICIPAL LIEN filed by Borough of Pottstown on 07/15/2020 in Case No. 2020-11659 in the amount of $790.18